THE STATE v. JAMES GARRETT, Appellant.

Division Two, December 23, 1918.

1. **ELISOR: Summoning Regular Panel.** Where the record shows that the *elisor*, appointed at the previous term because of the prejudice of the sheriff, made a return of his *venire*, giving the names of forty qualified jurors, who were impaneled and sworn in the murder case, and nothing to show that the court gave any direction to the *elisor* as to whom he should summon or that any member of the regular panel was on the list, an objection that the court directed the *elisor* to call some of the regular panel as jurors in the case is without merit.

2. **INSTRUCTION: Feeling for or Relation to Defendant.** A cautionary instruction on the credibility of witnesses, telling the jury that in determining the weight to be given the testimony of any witness they may "take into consideration his or her interest, if any, in result from the trial, and his or her feeling for or relation to defendant," includes a relation of antagonism as well as of friendship, and applies to all witnesses who testified,

State v. Garrett.

for or against defendant, and is not likely to be misunderstood by the jury.

3. ———: **Inference Upon Inference: Circumstantial Evidnce: Facts to be Proven.** An instruction which tells the jury that "if certain facts and circumstances" are proven by the State from which you "may infer other and connected facts" which usually and reasonably follow according to the common experience of mankind, and if such "facts and circumstances are consistent with each other," etc., and if such "facts and circumstances have been proven" so as to satisfy your minds and consciences beyond a reasonable doubt, etc., does not permit the jury to infer certain facts from facts proven, and from these inferences deduct a further inference of guilt, but requires the "facts and circumstances" which must be consistent with defendant's guilt to be proven; and if the awkwardly expressed wording was calculated to mislead the jury, that danger was removed by two instructions for defendant which clearly defined circumstantial evidence and the conclusions that may be drawn from it, and therefore the instruction cannot be held to have misled the jury.

4. ———: **Deliberatly: Must Be Defined.** It is unnecessary to prove deliberation when homicide has been committed in the perpetration of, or in an attempt to perpetrate, robbery or other felony. But though there is some evidence to show that the homicide was committed in the perpetration of another felony, yet if no instruction is given requiring the jury to find that such other felony was perpetrated or attempted, it is necessary to define deliberately in a case of first-degree murder.

5. ———: ———: **Must Be Proven and Defined.** Deliberation is an essential element of murder in the first degree, and to sustain a verdict every constituent element of the crime must be proven, and in order that the jury may be able to find the element of deliberation they must be instructed how to find it, that is, it must be defined. The only exception to this rule is made by the statute (Sec. 4448, R. S. 1909) which makes the commission or the attempt to commit a felony the legal equivalent of deliberation and proof of deliberation in the murder trial unnecessary; but if there was no instruction requiring the jury to find that the homicide was committed in the perpetration or attempted perpetration of another felony, and it cannot therefore be said that they found that such felony was perpetrated or attempted, it was reversible error in the murder trial to fail to define deliberately.

6. ———: ———: ———: **Excuse: No Showing of Want of Deliberation.** A failure to define deliberately cannot be excused on the theory that all the evidence tends to show the homicide was done deliberately and none tends to show a want of deliberation. [Distinguishing State v. Ferguson, 162 Mo. 668 and 152 Mo. 196; State v. Jackson, 167 Mo. 291, and State v. Tettaton, 159 Mo. 377,

and pointing out that if those cases announce a contrary doctrine they conflict with State v. Hill, 69 Mo. 451; State v. Mitchell, 64 Mo. 191; State v. Dearing, 65 Mo. 530; State v. Daly, 210 Mo. 1. c. 679; and State v. Sims, 71 Mo. 538.]

Appeal from Saline County Criminal Court.—*Hon. John A. Rich,* Judge.

REVERSED AND REMANDED.

*Roy Rucker* and *R. M. Reynolds* for appellant.

*Frank W. McAllister,* Attorney-General, *Clarence P. LeMire* and *Thomas J. Cole,* Assistant Attorneys-General, for respondent.

(1) The failure of the trial court to define the word "deliberately" in its instructions to the jury was not reversible error. (a) An instruction defining "deliberately" was not necessary in this case, because the evidence shows that the murder was committed while the defendant was engaged in the perpetration of a robbery. Sec. 4448, R. S. 1909; State v. Bobbitt, 215 Mo. 39; State v. Daly, 210 Mo. 679; State v. Foster, 136 Mo. 655; State v. Schmidt, 136 Mo. 651; State v. Meyers, 99 Mo. 112; State v. Hopkirk, 84 Mo. 287; State v. Green, 66 Mo. 648; State v. Jennings, 18 Mo. 444. (b) Improper definitions of "deliberately" in instructions have not, in certain cases, caused a reversal. State v. Jackson, 167 Mo. 296; State v. Ferguson, 162 Mo. 677; State v. Tettaton, 159 Mo. 377; State v. Ward, 74 Mo. 256. (2) The instruction on circumstantial evidence in this case (No. 6 given on behalf of the State) was in proper form. State v. Bauerle, 145 Mo. 16; State v. Taylor, 134 Mo. 151; Ferris & Rosskopf, Instructions to Juries, sec. 539, p. 635, Instruction 8.

WHITE, C.—The appellant was found guilty of murder in the first degree in the criminal court of Saline County. He was charged with having killed, on

the sixth day of January, 1917, Mrs. Sarah J. Campbell, a widow sixty-five years of age.

Mrs. Campbell lived at New Frankfort, a small town on the south side of the Missouri River, in Saline County. Her husband had died in June, 1916. It was reputed in the neighborhood that Mrs. Campbell kept a large amount of money about the house. During her husband's life they had manufactured and sold large quantities of wine on the premises. After his death, her sister testified to having seen $430 in her possession; she was known to have cashed checks and received money amounting to three or four hundred dollars; besides she had kept at the house where she lived the remnant of a stock of groceries, from which she sold to neighbors who came there from time to time for the purpose of buying. The amount of money she received for these groceries is not shown. After her death $69 was found hidden in a can on her premises. She lived alone in a house in New Frankfort, where her body was found on the eighth of January, 1917. She had been killed by a pistol shot which was fired into the back of her head.

It was the theory of the State that Mrs. Campbell was killed Saturday, January 6, 1917, at an early hour in the evening. One Rufus Kemper, who testified for the State, said he went to see her about 5:30 o'clock that afternoon, in regard to the sale of her place; that then she was in apparent good health; he stayed only about fifteen or twenty minutes. He was accompanied by a boy by the name of Press Givens.

One Forrest Kalinka visited Mrs. Campbell's house Friday, January 5th, and arranged with her to borrow her cart. He returned for the cart about ten o'clock Sunday morning, January 7th. He knocked but was unable to make anybody hear, and called to Mrs. Campbell loud enough to be heard by anyone in the house, without receiving any response. He then took the cart and went away with it. On Monday, the eighth, Mrs. Campbell's body was discovered. Two boys, who were witnesses, testified to hearing one or more shots about

dark or soon after, Saturday night, in the direction of Mrs. Campbell's house. It was impossible for the phy-sician, who examined the body when found, to state whether she had been dead exceeding eight hours or not, but she might have been dead two or three days.

When found, deceased had on her night dress, but over her underclothes, and the bed in the room in which she was found had not been disturbed or turned down; the furniture in the room was undisturbed.

The defendant, James W. Garrett, was a nephew of the deceased. Until a few months before the murder he had lived and conducted a sort of restaurant in Salisbury, in Chariton County. After his wife died he moved to Moberly, and was living there with a married daughter at the time of the death of Mrs. Campbell. After his removal to Moberly he had visited his aunt, Mrs. Campbell, and appeared to be interested in her business affairs. He stated to several persons that he was trying to get her to sell her property and move to Moberly to live with him. A number of witnesses testified that he had said to them she would be found dead in her house some day. Some of these statements indicated that he expected her to be murderd for her money, and others that he expected her to be killed by an overdose of morphine. Garrett was a poor man and there was no indication of his having had money of any consequence prior to the death of his aunt. On the 5th of January, 1917, he went to several of his friends and relatives in Moberly and endeavored to borrow a pistol, saying that he was going to Higbee to buy a hotel and didn't wish to stay away all night without one. He was unable to borrow one. He was seen to take the train going south on the M., K. & T. Railroad about 11:30 a. m., January 6th. This train connected at Higbee, a few miles from Moberly, with the C. & A. going west, which crosses the Missouri River into Saline County and runs through the towns of Gilliam and Slater. Gilliam is about six miles from New Frankfort, where Mrs. Campbell lived, and Slater is a station about three miles west of Gilliam. The C. & A. passed through

Higbee going toward Slater about three or four o'clock in the afternoon. Several witnesses swore to having seen Garrett on the Chicago & Alton train Saturday afternoon, and some testified to having seen him get off the train at Gilliam and to having heard him inquire for a livery stable. That was about 5:30 p. m. He was directed to the livery stable of Robert Ayres. A man answering his description appeared at that livery stable, hired a horse and rode off on it; he said he was going to Babbler's place to see a man named John Skinner; he said he lived at Salisbury and gave his name as Winkler. Babbler's place was within a mile of New Frankfort; it was shown that no one by the name of John Skinner lived on Babbler's place, and no one by the name of Winkler lived in Salisbury.

One witness testified to having seen the defendant ride out of Gilliam on horseback that afternoon. The same man who hired the horse returned with it about 8:45 p. m., and the defendant was identified as that man by two or three witnesses who happened to be at the livery stable. He asked when the train going north would come and was told it would be midnight. He said it was a long time to wait, and disappeared.

Two or three witnesses who boarded the east-bound train at Slater, three miles west of Gilliam, near midnight, testified that defendant got on the train at that point. These witnesses had waited at the Slater depot for the train and did not see him enter the station. They saw him get on the train, appearing, it seems, from somewhere outside.

He attended the funeral of his aunt on the 9th of January, was drinking a good deal, and appeared to be very nervous. He also appeared to be nervous in Moberly on the 8th, on which day some witnesses swore to having seen him with large sums of money. He was arrested on the day of the funeral and had $328 in bills on his person. He then said to the sheriff that it was the proceeds of the sale of his restaurant in Salisbury, and later said to the deputy sheriff that it was his son's money.

The horse which Ayres hired to Garrett was unshod, and its feet had been broken in a way to make its tracks peculiar. The horse was well known in the neighborhood, having carried the mail on the route going out from Gilliam. It was recognized by one witness just after dark, by moonlight, on the sixth, about two and a half miles from Gilliam on the road to New Frankfort, ridden at the time by a man who answered the description of the defendant. Leading up to the barn on the premises where the deceased had lived, and leading away from it, were the tracks of a barefoot horse. These tracks showed that the left forefoot had a notch broken out of it, and the right hind foot was broken off at the toe, making it square at the front. That condition corresponded to the defects in the right hind foot and the left forefoot of Ayres's horse. Some of these tracks were in soft ground and had retained their shape. The horse was brought over from Gilliam to New Frankfort, his left forefoot and right hind foot inserted into two of the tracks mentioned, and both fitted exactly. This experiment was made in the presence of a number of witnesses.

When arrested the defendant protested his innocence, said he was all day on the sixth at his daughter's home in Moberly, and in the evening at the home of some friends named Bell. He also said he knew who did commit the crime and would lay his hand on the guilty person as soon as his own trial was over. At the trial he produced two witnesses who testified that they saw him eat his dinner in Moberly at a restaurant—which one of them ran and in which the other one was employed—between 3:20 and 4 o'clock, Saturday afternoon, the sixth. None of his relatives or friends with whom he claimed, when arrested, to have been on Saturday, were offered as witnesses in his behalf to support his defense of alibi.

I. When the case was called for trial the defendant filed a motion asking the court to order the appoint-

ment of an *elisor* to summon the jury, on the ground that the sheriff was prejudiced. The motion was sustained, an *elisor* appointed and qualified, and the case continued until the succeeding term. At the succeeding term, the *elisor* was ordered to summon the jury panel, and the following appears in the record of that day:

*Elisor.*

"Counsel for defendant objected to the court directing the *elisor* to call any of the jurors summoned on the regular panel for this term of court for service as jurors in this case [all but seven of whom had been previously excused by the court] for the reason that the court nor any other person should suggest to the *elisor* whom he should call.

"Objection overruled by the court and defendant excepted to the ruling."

To this ruling error is assigned.

It is unnecessary to consider the merits of this assignment. A transcript of the record proper shows that the *elisor* made a return of his *venire* giving the names of the panel of forty jurors who were impaneled and sworn. There is nothing in the record to show that the court gave any direction whatever to the *elisor* as to whom he should summon, nor that any of the regular panel objected to were on the list.

II. Objection is made to a cautionary instruction on the credibility of witnesses which told the jury that in determining the weight, value and credit to be given the testimony of any witness they may "take into consideration his or her interest, if any, result from the trial, and his or her feeling for or relation to the defendant."

*Cautionary Instruction.*

It is claimed that the instruction directed attention alone to the witnesses for the defendant, and did not include witnesses for the State. A similar instruction was approved by this court in the case of State v. Miller, 190 Mo. l. c. 461. The statement, "feeling for or relation to the defendant," would include a relation of antagonism as well as of friendship; it would apply to

all witnesses who testified, for or against the defendant, and was not likely to be misunderstood by the jury.

III.    Appellant complains of the giving by the court of instruction Number Six at the request of the State, which is as follows:

"The court instructs the jury that it is not necessary to prove the defendant's guilt by testimony of witnesses who may have seen the offense committed. The court further instructs the jury that if

Inference upon Inference.

certain facts and circumstances are proved by the State, from which facts and circumstances the jury may infer other and connected facts which usually and reasonably follow according to the common experiences of mankind, and that such facts and circumstances are consistent with each other and with the guilt of the defendant, and inconsistent with any reasonable theory of the defendant's innocence, and that such facts and circumstances have been proven so as to satisfy the minds and consciences of the jury beyond a reasonable doubt that the defendant willfully, feloniously, deliberately, premeditatedly, on purpose and of malice aforethought did kill Sarah Campbell, the deceased person testified to in evidence herein, then the jury are warranted to find the defendant guilty as charged in the information, and assess his punishment as defined in other instructions filed herein, though no witness has testified of his own knowledge as to the actual fact of such killing."

The instruction is awkwardly expressed and mixes a definition of circumstantial evidence (State v. Bauerle, 145 Mo. l. c. 16) with a direction to the jury as to what they should find in order to convict. It is insisted that it is in such form as certainly to mislead the jury as to the effect of circumstantial evidence. The precise objection to it is that it permits the jury to infer certain facts from facts proven and from those inferences deduct a further inference of guilt—an inference from an inference. We think the instruction is not susceptible of that construction. It says, "if certain facts

and circumstances'' are proved by the State from which facts and circumstances the jury *"may infer other and connected facts"* which usually and reasonably follow according to the common experience of mankind; and, if such *"facts and circumstances"* are consistent with each other and with the guilt of the defendant and inconsistent with any theories of his innocence; and, that such "facts and circumstances *have been proven* so as to satisfy the mind and conscience of the jury beyond reasonable doubt," etc.

It is clear that the "facts and circumstances" which must be consistent with each other and with the guilt of the defendant and inconsistent with his innocence so as to satisfy the jury of defendant's guilt are the facts and circumstances which *must be proven* and not the "other and connected facts" which may be inferred. The instruction is not open to the objection presented, although the principle might be expressed much more clearly. If there was any danger of it misleading the jury by reason of its involved expression, that danger was removed entirely by two instructions given at the instance of defendant, which clearly defined circumstantial evidence and the conclusions that might be drawn from it, as such definition has been approved by this court in the case last cited.

IV.    In instructing the jury the trial court used words descriptive of the offense, "unlawfully, willfully, feloniously, deliberately, premeditatedly and of malice aforethought," and defined each term
**Deliberately.** except the word "deliberately." Defendant asked an instruction which defined each of the terms comprising the constituent elements entering into murder in the first degree, including "deliberately," and that instruction was refused. Error is assigned to the ruling of the court in that regard.

Deliberation is one of the essential elements which enters into the commission of the crime of murder in the first degree and frequently it has been so recognized and defined by this court. [State v. Spaugh, 200 Mo. l. c.

606-7; State v. Davis, 226 Mo. 515.] It is claimed by the State that inasmuch as there was evidence which tended to show the crime was committed in the attempt to perpetrate robbery, it was unnecessary to prove or require a finding of deliberation. It is true Section 4448, Revised Statutes 1909, makes homicide murder in the first degree when committed in the perpetration of, or attempt to perpetrate, robbery or any of the other felonies mentioned. In such case proof of deliberation is unnecessary. The commission of, or attempt to commit, such felony stands, under the statute, as the "legal equivalent" of premeditation and deliberation. [State v. Bobbitt, 215 Mo. l. c. 33; State v. Daly, 210 Mo. l. c. 679; State v. Myers, 99 Mo. l. c. 113; State v. Foster, 136 Mo. 653.] It was necessary for the jury to find, either that the act was committed deliberately, or, that it was committed in an attempt to perpetrate, or in the perpetration of, robbery. There was some evidence in this case tending to show the homicide was committed in the perpetration of robbery, but no instruction was given by the court requiring the jury so to find, and it cannot be said that they found robbery was attempted or perpetrated. Therefore, it remains that they must have been required to find that the murder was deliberate.

But it is claimed by the State, since all the evidence tends to show the act was done deliberately, and none tends to show a want of deliberation, the finding by the jury of deliberation was unecessary and a definition of the term was not required. It is true there are some cases in which this court has affirmed convictions of murder in the first degree where there was an imperfect definition of deliberately. [State v. Furgerson, 162 Mo. 668, l. c. 677; Id. 152 Mo. l. c. 96; State v. Jackson, 167 Mo. 291; State v. Tettaton, 159 Mo. 377-8.[ In each of those cases the definition of "deliberately" was faulty in that it omitted some element. It was held that inasmuch as there was no evidence which tended to show the crime was committed under circumstances which would reduce it to a lower grade of offense than murder

in the first degree, the error in the definition of deliberately was harmless. These cases follow the cases of State v. Ellis, 74 Mo. 207, l. c. 221; State v. Kotovsky, 74 Mo. 247, and State v. Ward, 74 Mo. 253. In each of the cases last cited the evidence showed exactly how the deed was done and showed affirmatively that the homicide was committed deliberately, and affirmatively showed it could not have been committed in any other way than deliberately. The same may be said in the case of State v. Jackson, supra, opinion written by Burgess, J. In each of the cases of State v. Tettaton and State v. Furgerson, supra, there was no eye-witness to the homicide and from the meager facts given it is possible to infer that because there was no affirmative evidence to show a lower grade of offense than murder in the first degree the court held a proper definition of "deliberately" was unnecessary. It never has been held, in any case brought to our attention, that no definition at all would be harmless, even in a case of that kind.

In establishing the guilt of a defandant charged with a crime it is essential to prove every constituent element of the crime charged. [State v. Langley, 248 Mo. 545, l. c. 553; State v. Daly, 210 Mo. 679.] The term "deliberation" or "deliberately," has a special significance in defining the crime of murder. The lay mind would not be likely to distinguish "deliberation" from "premeditation." In some jurisdictions the words deliberation and premeditation, used in defining the crime, are held to be synonymous. [Words and Phrases, "Deliberation."] But our statute makes deliberation the distinctive quality which separates murder in the first degree from murder in the second degree; murder in the second degree requires premeditation, but not deliberation. For that reason deliberation, as well as premeditation, must be proved and found by the jury in order to convict a defendant of murder in the first degree. The jury must be instructed how to find it. [State v. Hill, 69 Mo. 451; State v. Mitchell, 64 Mo. 191; State v. Dearing, 65 Mo. 530; State v.

Daly, 210 Mo. l. c. 679; State v. Simms, 71 Mo. 538, l. c. 540.] If the decisions in the Furgerson case and the Jackson case, and the cases grouped with them, supra, may be interpreted to hold that the absence of evidence which might reduce the crime to a lower grade than murder in the first degree, would render a finding of deliberation unnecessary and a definition of the term superflous, then they are in conflict with the group of cases last cited.

Since every element of a crime must be proven in order to convict, and since deliberation is an essential element of murder in the first degree, it must be proved and found by the jury under proper instruction like any other fact. Does the absence of evidence upon which to predicate an instruction for murder in the second degree warrant a refusal to instruct *fully* as to murder in the first degree or obviate the necessity of defining the terms used in describing it? Though all the evidence tended to show murder in the first degree and nothing else, the jury was not relieved of the necessity of finding *all* the facts, and the court was bound to instruct them properly as to what they must find in order to convict.

For the reasons mentioned, the failure to define the term "deliberately" was error, for which the judgment must be reversed and the cause remanded.

It is so ordered.

PER CURIAM:—The foregoing opinion by WHITE, C., is adopted as the opinion of the court. All of the judges concur.