## Hale v. Commonwealth.

(Decided Feb. 23, 1937)

ELMER L. BROWN and W. E. AUD for appellant.

B. M. VINCENT, Attorney General, and ROSCOE VINCENT, Assistant Attorney General, for appellant.

OPINION OF THE COURT BY CHIEF JUSTICE RATLIFF—Affirming.

The appellant and Henry ("Possum") Simmons were jointly indicted at the September term, 1935, of the Daviess circuit court for the murder of Ezra Boarman. Simmons was tried at the January, 1936, term of the court, convicted of manslaughter, and sentenced to 12 years in the penitentiary. He did not appeal. The appellant Hale, was tried at the May, 1936, term of the court, convicted of manslaughter and sentenced to a term of 6 years in the penitentiary. He appeals.

Various grounds are insisted on in brief of appellant for a reversal. First, it is insisted that the court erred in overruling the demurrer to the indictment. The accusatory part of the indictment "accuse the defendants, Thomas Hale, and Henry (Possum) Simmons, and each of them, acting jointly and together, one with the other, each aiding, assisting, abetting, counseling, advising and encouraging the other, of the crime of wilful murder, committed in manner and form as follows, etc." The descriptive part of the indictment is substantially in the same language as the accusatory part and further charges that the defendants willfully, maliciously, and feloniously and of their malice aforethought did kill, slay, and murder Ezra Boarman by shooting and wounding him, etc.

The objection offered to the indictment is that it does not charge that the abettor was "near enough to" the other to aid, counsel, abet, etc.

We do not think that the omission of the words "near enough to" renders the indictment defective. We think the charge that the defendants acted jointly and together one with the other, each aiding, assisting, abetting, counseling, advising, and encouraging the other, is sufficient to inform the defendants of the nature of the charge and to enable the court to pronounce judgment in the event they or either of them are found guilty.

Section 136, Criminal Code of Practice, reads:

"The words used in a statute to define an offense need not be strictly pursued in an indictment, but other words conveying the same meaning may be used."

The language used in the indictment being sufficient to inform appellant of the nature of the charge, he

could not have been misled in the preparation of his defense or otherwise prejudiced in his rights. See Overstreet v. Com., 147 Ky. 471, 144 S. W. 751. Merdith v. Com., 199 Ky. 544, 252 S. W. 894. See, also, section 137, Criminal Code of Practice.

The next insistence is that the court erred in overruling appellant's motion to peremptorily instruct the jury to find a verdict for the defendant. This calls for a resume of the evidence.

In the early afternoon on the 14th day of September, 1935, Hale and Simmons met with each other about the courthouse square or hall in Owensboro. Hale was intoxicated and soon after he met Simmons he purchased more whisky and they continued to drink until Hale became drunk or considerably intoxicated. At the request of Hale, Simmons secured a taxicab to take them out in the country, Hale furnishing the money with which to pay the taxi fare. The taxicab driver, Leslie Drury, took them to a place known as the "Ravine" on or near the Ohio river bank not far from the city of Owensboro, where Hale got out of the taxicab and Simmons returned to the city of Owensboro with the taxicab driver. This was about 6:30 or 7 o'clock p. m. About 9 o'clock of that evening the deceased, Boarman, and one Wayne Richards, drove up to a roadhouse in or near the city of Owensboro known as "The Kentucky Inn." They were there introduced to two girls, Mary Rose Stites, and Christine Lanham. Deceased was driving a Ford coupe automobile and he and Richards together with the two girls, visited other drinking resorts and finally the Stites girl, who was an acquaintance and friend of Hale, suggested that they drive down to the Ravine, the place where Hale was left by Simmons and the taxi driver. Upon their arrival at the Ravine the deceased alighted from his automobile and while he was trying to induce one of the girls to get out of the car, which she refused to do, a man appeared by the side of the car and commanded deceased to "stick 'em up" and immediately the man fired a shot resulting in the death of the deceased.

The Commonwealth introduced as its first witness Wayne Richards, and he related what happened when they arrived at the Ravine as follows:

"Mr. Boarman drove up in that lane and got out of the car and walked around the car and said something, and I don't know what he said; and this fellow was standing by the side of the car when I saw him and he said 'Give it up,' and he said 'All right, buddy, you can have it,' and he lammed away and shot him.

"Q. Do you know who shot him? A. No sir.

"Q. Was it dark there? A. The moon was shining, but it was underneath the trees and dark."

He further stated that when the shot was fired he immediately left the scene and ran out through a field. Leslie Drury, the taxicab driver, testified that at the time Simmons employed his taxicab in Owensboro, on the evening just before the homicide, Simmons told him, Drury, to come down and take him and Hale out in the country. He went down the street and picked up Hale and they drove out the road and when they reached the place called Ravine, Hale got out of the car and Simmons returned with him to Owensboro. He was asked if he observed Hale's condition and he said: "He seemed to be drunk." He was further asked if he knew whether Hale was really drunk or playing drunk, and he said he could not say.

Mary Rose Stites related what happened when they arrived at the Ravine and just immediately before the homicide, as follows:

"We hadn't been setting there I don't guess over five minutes and Mr. Boarman tried to get Christine to come out of the car and she wouldn't do it, and 'Possum' Simmons came up and said: 'Stick 'em up,' and Mr. Boarman said he wasn't going to do it, or something, and a shot was fired.

"Q. Where was Tom Hale? A. I didn't see him until after the shot was fired. Christine asked would he take us back to the Kentucky Inn.

"Q. Did he take you? A. Yes sir.

"Q. Whose car did he drive? A. Mr. Boarman's."

She further said that they left Boarman lying on the ground dead. She said that it was dark, but there

were lights on the car and she could see in front of it and she only saw one man. On cross-examination she testified that Tom Hale did not fire that shot, and she did not see him before it was fired. Christine Lanham testified about meeting the deceased and Richards in Owensboro and said that they drove around over the city to various places, and finally Mary Rose Stites suggested that they go down to the Ravine, and when they arrived there the deceased got out of the car and walked out on the side she was on and asked her to get out, but she still sat there and then "Possum" (meaning Simmons) walked up and shot Boarman. She said that she did not see Hale at that time, but soon after the shot was fired Hale walked around from the back of the car. She said that she did not see the man who fired the shot until the pistol flashed and then she saw it was Simmons and when Hale appeared from behind the car he asked them if they were ready to go back to the Kentucky Inn and she told him that they were and they got into deceased's car and Hale drove them back to the Kentucky Inn. She said she was unable to give any explanation why Mary Rose Stites wanted to go down to the Ravine. It appears that the place called the Ravine was a dump ground for refuse and on a narrow road leading back toward the river. She was asked if Hale was drinking when he came up to the car or at the time the homicide was committed, and she said she did not pay any attention as to whether he was or not, although she rode with him back to Owensboro. She said she did not know what became of the man who fired the shot.

Simmons who was then serving his term in the penitentiary as stated above, was introduced as a witness for the Commonwealth. He admitted that he had theretofore been convicted for confederating with Hale and killing Ezra Boarman and was then serving his time in the penitentiary. He stated that on the afternoon of the homicide he met with Hale at about 4 o'clock near the courthouse in Owensboro and that there was no one with Hale at that time. However, while they were there he saw Hale talking to Mary Rose Stites and Christine Lanham. He told about walking around over town, and at the suggestion of Hale, he then made arrangements with Drury to take him and Hale down to

the Ravine; that Hale told him just before he got with
Drury that he wanted to go down there. He was asked:

"Q. Why did he say he wanted to go down
there? A. He said he wanted to go down there and
pull a job.

"Q. Did he say who he was going to pull it
with? A. No sir, he said them girls would bring a
party there. I didn't know who he was supposed
to bring, but he said he would bring a party
there and that was his reasons for going there."

He further said that when they arrived at the
Ravine Hale got out of the car and he returned to
Owensboro with the taxicab driver, and did not see Hale
any more until the day after the homicide. In reference
to Hale being drunk, he said he was drinking pretty
heavy but he did not know whether you would call it
drunk, but he was drinking, and he thought that he
knew what he was doing. He said that Hale was not
drinking at the time he told him that he wanted to go
down to the Ravine. He further said that he saw Hale
on the next morning and had a conversation with him
in which Hale said that he killed Ezra Boarman. He
was asked if Hale told him how it happened and he
answered:

"He said he told him to stick 'em up and he re-
fused to raise his hands and he shot him."

The appellant, testifying in his own behalf, ad-
mitted meeting Simmons about the courthouse in Ow-
ensboro and said that Simmons told him that he had
just got out of the penitentiary and was broke, and
asked him if he had anything to drink. He told him he
guessed he could get some and went down the street
and got two pints of whisky. He, Simmons, and other
boys drank that two pints and then they procured more
whisky and finally he, Hale, became very drunk and
got sick. He said he gave Simmons $1 and told him to
get a taxicab and take him home, and gave him his
street address; Simmons told him to walk on down
the street and he would get a cab and take him home,
and he went down the street a certain distance and
sat down, and that was the last thing he remembered.
He said he had no recollection of going to the Ravine

and getting out there as related by the other witnesses, and the next thing he knew was when the deceased, Richards, and the two girls drove up to the place where the homicide occurred. He said the car pulled up under a tree and stopped and deceased got out of the car and came around the front end of it and opened the front door and about that time Simmons stepped around and he, Simmons, and the deceased started scrambling, and then the shot was fired, and then Richards ran off; that he walked around to the car and told the girls to jump out and asked the Stites girl, "Who are you?" and she told him her name and then he told her who he was and said, "You all jump out and help me put this man in the car and take him to the hospital and try to save him." And he further said to them, "It is Ellis Gregson, and they said, 'Let's go to the Kentucky Inn and call the law and ambulance,' and I got hold of the man and raised him on my left arm and he was a large fellow and was kicking and taking on and I couldn't handle him. I asked them again to get out and they wouldn't get out and they were sitting up there crying and said, 'Let's go back to the Kentucky Inn and call the law.' " He said he then got in the car and turned it around and drove back to town. He denied that he told Simmons on the next morning that he killed deceased and also denied that he had any understanding with the girls to go down there that night or that he said anything to them about "putting up a job," and also denied that he shot deceased.

It will be seen that the evidence of the appellant and that of the two girl witnesses is not very well in harmony. The girl witnesses said that when the shot was fired Hale appeared immediately from behind the car and asked them if they were ready to go to town and they told him they were. But according to his evidence he asked them to jump out of the car and help put the wounded man in the car and take him to the hospital and they suggested that they go back to the Kentucky Inn and call the law and an ambulance. And another noteworthy incident is that according to the evidence of Mary Rose Stites she and Hale had been acquainted with each other for four months or longer, and, according to the undisputed evidence of the Lanham girl the Stites girl suggested that they go down to the Ravine where Hale was. It appears from the evi-

dence that Hale and the Stites girl knew each other, but according to Hale's evidence he and the Stites girl did not know each other and told each other their names. It would appear from this evidence they were strangers.

It is earnestly insisted for appellant that the evidence of the eyewitnesses shows conclusively that Simmons fired the shot that killed deceased and that there is no evidence tending to connect Hale with the homicide. It is insisted that Simmons' evidence should not be believed or given any weight whatever. Simmons, having been convicted of a felony, and for being connected with this particular offense, went to the credibility only of his evidence. The jury had the right to give it such weight as it saw proper. According to the evidence of the two girls, Simmons fired the shot, but the jury was not bound to accept their evidence in preference to that of Simmons. According to Simmons' evidence, Hale was talking with these two girls before they left Owensboro. After Richards and the deceased met with the two girls, it is shown that the Stites girl, who was an acquaintance and friend of Hale, suggested that they go to the Ravine. The record does not show that she had been informed of Hale having been left at the Ravine after Simmons took him there and returned to Owensboro. In the circumstances the jury may have believed that this arrangement was made between Hale and the girl before Hale and Simmons left Owensboro. The two girl witnesses were not impeached for truth and veracity or otherwise, but the record indicates that they were indeed very indiscreet. It appears that they were for the first time introduced to Richards and Boarman on the night of the homicide and they proceeded to visit various drinking resorts over the city and then Miss Stites suggested that they drive down the road to this dark, isolated place called the Ravine to see Hale. Perhaps their conduct and indiscretions discredited their testimony in the minds of the jury as much as Simmons' former conviction of a felony discredited his evidence. Other circumstances tend to discredit the testimony of the girls. Mary Rose Stites admitted that she had been acquainted with Hale for some time but was not acquainted with Simmons and did not know him until the day of the trial. But she stated that from the light of the flash of the pistol she recognized Simmons as the man who fired the shot. An-

other significant fact is that these girls who testified that Simmons fired the shot could not account for Simmons after the shot was fired, but immediately thereafter Hale walked around from behind the car. In the circumstances the jury may have believed that Hale fired the shot and then walked around behind the car and appeared on the scene in the manner described by the witnesses; or it may have believed that Simmons fired the shot and Hale was present and aided and abetted.

The record of Simmons' trial is not before us, nor is it shown upon what theory the jury convicted him. The two defendants were charged jointly as principals, one doing the actual shooting and the other one aiding and abetting, and it may be that the jury that convicted Simmons believed that he fired the shot or it may have believed that Hale fired the shot and Simmons was present and abetted therein as charged in the indictment. It follows that the conviction of Simmons does not exonerate Hale.

In view of all the circumstances surrounding this homicide, we think the evidence was not only sufficient to take the case to the jury, but also sufficient to sustain the verdict. See Jackson v. Com., 248 Ky. 47, 58 S. W. (2d) 263; Newsome v. Com., 240 Ky. 333, 42 S. W. (2d) 306.

It is next contended that the court failed to instruct the jury on the whole law of the case. The complaint is that the court failed to define the words "accomplice" in instruction No. 5. That instruction reads:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense and the corroboration is not sufficient if it merely show that the offense was committed and the circumstances thereof."

Instruction No. 1 reads as follows:

"If you shall believe from the evidence beyond a reasonable doubt that the defendant, Thomas Hale, in this county and before the finding of the indictment herein, alone or while acting with one Henry (Possum) Simmons, each aiding, assisting, abetting, counseling, advising or encouraging the other, wilfully, feloniously and of his malice aforethought,

did shoot at and wound Ezra Boarman, as that he then and there died thereby, then he is guilty of wilful murder as charged in the indictment and you ought to so find and fix his punishment at death or at confinement in the state penitentiary for life, in your discretion."

It will be seen that this instruction followed the language of the indictment and authorized the jury to find appellant guilty if it believed from the evidence that appellant alone, or while acting with Simmons, each aiding, assisting, abetting, counseling, advising, or encouraging the other in the commission of the homicide.

Once instruction No. 5 is read and considered in connection with No. 1, we do not think it was reversible error to fail to define the word "accomplice." If the defendant committed the acts in the way and manner set out in the indictment and in instruction No. 1, the jury had the right to find him guilty either as principal or as aider and abettor, and we do not see wherein a definition of the word "accomplice" would have been helpful to the defendant. It has been held by this court in numerous cases that the failure of the court to define certain terms, "wilfully," "feloniously," "maliciously," or "malice aforethought" is not reversible error. See Timberlake v. Com., 245 Ky. 163, 53 S. W. (2d) 345; Collier v. Com., 160 Ky. 338, 169 S. W. 740. On examination of the instructions for ourselves, we conclude that that they are substantially correct.

Finding no error prejudicial to the substantial rights of the defendants, the judgment is affirmed.