THE STATE v. WILLIAM F. LaMANCE, Appellant.—154 S. W. (2d) 110.

Division Two, September 25, 1941.

*Harry K. West* for appellant.

486

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

488

WESTHUES, C.—Appellant, LaMance, was charged, by an information filed in the Circuit Court of Linn County, Missouri, with the murder of his wife, Ella LaMance. A change of venue was granted and the cause was transferred to Chariton County, Missouri. The regular judge was disqualified and the Honorable James S. Rooney presided at the trial. A jury found LaMance guilty of murder in

the second degree and fixed his punishment at eighteen years' imprisonment in the penitentiary. From the sentence imposed LaMance appealed.

Appellant in his assignments of error has preserved for our review rulings of the trial court on a plea in abatement and also a motion to suppress evidence. We will dispose of these preliminary questions before going to the other assignments. To intelligently pass upon these questions it will be necessary to make a brief statement of the facts and events preliminary thereto. Appellant was a graduate of a school of osteopathy and was practicing his profession in Laclede, Missouri. His wife, Ella, was a graduate nurse and as such aided her husband in his work. Appellant had his office in his home. He was thirty-three years of age and his wife twenty-nine. They had resided in Laclede about three years prior to the time Ella LaMance met her death. On August 9, 1938, the day Ella LaMance is alleged to have been murdered, Dr. LaMance and a number of others went fishing for the day. The doctor did not return to his home until 10:30 that night. Ella LaMance was last seen alive when she treated a patient at about 10:00 o'clock on the morning of August 9. A witness for the State, named, Harbaugh, testified that on Friday following he went to the LaMance home and he and appellant searched the premises and made inquiry as to the whereabouts of Mrs. LaMance; that they drove to Brookfield, then to Kansas City and on to Manitou Springs, Colorado, where they saw appellant's parents. On Sunday evening appellant, his mother and Harbaugh started back to Laclede, arriving there about 6 P. M. Monday, which was August 15. Shortly thereafter appellant drove to the county seat, Linneus, and informed the sheriff that his wife had disappeared and asked the sheriff for aid. The sheriff drove to Laclede and after a short time made a thorough search of the LaMance premises which resulted in a discovery of the body of Mrs. LaMance in a fruit cellar, located in the back yard under a building a short distance from the LaMance home. Before the body was found a young man asked appellant about the disappearance of his wife and informed him that it had been rumored about town that he had murdered his wife, and that some people intended to drag the pond that night. After the body was found, the officers, including the coroner and prosecuting attorney, questioned appellant very pointedly about some matters, which indicated he was under suspicion. Blood stains had been found on the walls of the kitchen, also on a day-bed and a pillow. Appellant claimed that he had cut his face with broken glass on the night of August 9, and that had been the cause of the blood stains.

Appellant was charged with the crime of murder. A preliminary hearing was had before L. W. Libby, a Justice of the Peace, in Jefferson township, Linn County, Missouri. Appellant's point, on his plea in abatement, is that Libby was not a Justice of the Peace,

having never been elected or legally appointed to that office. Linn County is under township organization. Sections 13962 and 13946, R. S. Mo. 1939, are involved. The record disclosed that Libby was not elected to the office of Justice of the Peace; that in the regular township election of 1937 two Justices of the Peace were elected; that Libby ran third on the ticket. Immediately after the election citizens of the township petitioned the county court requesting it to appoint Libby as a Justice of the Peace. It was alleged in the petition that the township had a population of over two thousand inhabitants and was therefore entitled to a third Justice of the Peace and that only two held that office. The county court made a finding that the township did in fact have a population of over two thousand inhabitants, and by virtue of Section 13962 appointed Libby a Justice of the Peace. Libby thereafter qualified and performed the duties pertaining to that office. Appellant did not question Libby's official capacity at the preliminary hearing. One of appellant's points is that Jefferson township did not in fact have a population of over two thousand and therefore the court was without authority, even in a proper proceeding, to appoint a third Justice of the Peace for the township. Appellant in his brief states:

"This honorable court has on many occasions taken judicial notice of official census of localities, towns, cities, and counties within Missouri and should now take judicial notice of that Jefferson Township in 1937 and now has less than 2,000 inhabitants. [Heather v. City of Palmyra, 276 S. W. 872, 311 Mo. 32; State v. Kenyon, 126 S. W. (2d) 345, 343 Mo. 1168.]"

At the hearing on the plea in abatement no evidence as to the population of Jefferson township was offered. Appellant's position must therefore be, that this court should set aside the finding made by the county court, to the effect that Jefferson township in 1937 had a population of two thousand inhabitants, by taking judicial notice of the census. Appellant does not state which official census we should consider. While a court may take judicial notice of an official census, we do not think such judicial notice authorizes setting aside a judicial finding as to the population of any city or township. Townships having a population of over two thousand inhabitants are authorized by Section 13946 to elect three Justices of the Peace. Under the finding made by the county court the township was therefore entitled to three Justices of the Peace.

 Next appellant says that even if Jefferson township had a population of over two thousand the county court had no authority to appoint a third Justice of the Peace until the voters of the township, by a vote at an election, authorized a third Justice. Appellant relies upon Section 13946, supra, as authority for his position. That section, however, merely says, that the voters of any township having a population of over two thousand inhabitants may elect an additional

Justice. It in no way curtails the authority given county courts by Section 13962, which authorizes the court to fill vacancies occurring in offices of the Justice of the Peace. Since the county court acted on petitions of the citizens of the township asking for the appointment of a third Justice, and since the county court found as a fact that under the law the township was entitled to have three Justices of the Peace, the appointment of Libby made him at least a *de facto* officer. [State ex rel. Walker v. Powles, 136 Mo. 376, l. c. 380, 37 S. W. 1124; State on inf. Gentry v. Toliver, 287 S. W. 312, 315 Mo. 737, l. c. 746.] On the question of *de facto* officers see 46 C. J. 1053; Usher v. Western Union Telegraph Co., 122 Mo. App. 98, 98 S. W. 84, l. c. 88.] The point must be ruled against appellant.

■ Appellant's motion to suppress pertains to evidence given by witness Koch concerning blood spots and stains found in the LaMance home and analyzed by the witness. Appellant's theory is that such evidence was obtained through an unlawful search and seizure. This point may be disposed of very briefly. Evidence revealed that appellant went to the sheriff and asked him to come to Laclede for the purpose of finding Mrs. LaMance; that when her body was found and he was being questioned he demanded that the sheriff do everything possible to determine the cause of death; that he offered to have his own blood tested and compared with the blood stains found in the home, claiming at the time (and appellant still maintains on this appeal) that the stains were those of his own blood. Appellant in support of his motion to suppress introduced the evidence of Max Brown, the sheriff, taken at the preliminary hearing. Note a question asked by appellant's attorney indicating his eagerness to give the sheriff and officers all evidence available.

"Q. In other words, Max, at no time, did Dr. LaMance or Mrs. LaMance, the mother, attempt to conceal any of these exhibits from you, they volunteered their assistance bringing them to you that night? A. Yes, sir.

"Q. That was on the night of August 15? A. 15th, yes, sir."

Appellant, having requested the officers to make the search, was estopped to assert that such a search was unlawful or unreasonable. [State v. Bliss, 8 S. W. (2d) 509, l. c. 510.]

■ Appellants insists that the evidence was insufficient to support a verdict of guilty. In the briefs the parties agreed that this is purely a circumstantial evidence case. It is also agreed that the rule in cases resting alone on circumstantial evidence is, the circumstances must be consistent with each other and with the hypothesis of the defendant's ■ guilt and inconsistent with any reasonable theory of the defendant's innocence. A review of the cases cited is therefore unnecessary. The record in this case contains over twenty-three hundred pages. We have read the evidence carefully, also the statements of fact and the arguments in the briefs on this point. Reading

this evidence and the briefs has left our minds, at least the writer's mind, in a state of confusion and with a desire to reach beyond the grave and inquire of Mrs. LaMance what really occurred. Perhaps the jurors, the triers of fact, while observing the witnesses, were able to separate wheat from chaff and distinguish truth from falsehood. That was their duty and responsibility. It is our task, however, to determine if the voluminous record contains evidence sufficient to establish a complete chain of circumstances pointing to the guilt of the defendant, excluding every reasonable theory of his innocence.

We will now supplement the brief sketch of the evidence, supra, with details. First of all the evidence as to a motive on part of appellant to murder his wife was extremely meager. The State in its brief made the following statement:

"It is true that the defendant and the deceased were a very affectionate couple and extremely devoted to each other from the time of their marriage up and until about four or five months previous to the homicide."

It was the State's theory that during the last few months serious differences developed between appellant and his wife due to his excessive drinking and neglect of his business. The evidence does justify an inference that appellant drank intoxicants somewhat beyond moderation, and that he neglected his business. The evidence also justifies the inference that the wife objected to that, but after reading the record we are unable to detect any evidence of serious trouble or quarrels resulting therefrom. It is said that Mrs. LaMance objected to appellant's fishing trips. However, the record shows that on Sunday before she met her death Mrs. LaMance and her husband went on a fishing party. Proof of a motive is not a necessary element of murder. It is, however, to be considered by the triers of fact. [30 C. J. 179, sec. 406, etc.] The evidence revealed that on August 9 appellant went fishing and failed to keep appointments with a number of his patients. That morning while one of the patients was waiting at the LaMance home Mrs. LaMance observed that appellant drove by, whereupon she treated the patient. Thereafter Mrs. LaMance was not seen alive again. Later appellant stopped at the home of the patient and asked if her finger had been treated. When informed that it had, he left, driving in the opposite direction from his home. Later that day another patient who had an appointment called at appellant's office but no one answered the door. This patient called at the LaMance home at intervals during the day, both morning and afternoon, without getting any response, then went to Brookfield for treatment. It might be observed here that no one noticed any activity about the LaMance home on August 9 from 10:00 A. M. until 10:30 P. M. The fishing party returned to Laclede about 5:30 P. M. Appellant, however, did not go to his home until about 10:30 P. M. During the hours from 5:30 P. M. to 10:30 P. M. appellant was seen drinking beer at

various places near Laclede. Shortly before 10 :30 P. M. two witnesses found appellant in his car which was off highway thirty-six in a ditch. These witnesses aided appellant in getting his car out of the ditch and one of them drove the car to the LaMance home where it was parked. Appellant started toward the house and the witnesses left and saw nothing more of him. About this time a crash of glass, some loud talking and a radio were heard. The witnesses who testified to these facts lived across the street from the LaMance home. Shortly after midnight E. M. McClaren called at the LaMance home for the purpose of obtaining the services of a doctor. The McClarens were expecting the birth of a baby. McClaren testified that appellant came to the door; that he was not dressed from the waist up; that he informed the witness he would be down in a few minutes. McClaren left but soon became nervous at the delay, returned to the LaMance home and found the doctor dressed. McClaren further testified that appellant remained at his home from about 1 :30 A. M. until 1 :00 P. M.; that the baby was born at about 8 :00 A. M.; that the doctor asked permission to take a nap and slept until about 1:00 P. M.; that while there he was asked about his wife, because she often aided him in such cases, and appellant replied that she had gone visiting. The evidence revealed that Mrs. LaMance had on various occasions during her married life absented herself from home without informing appellant of her whereabouts; that appellant would make a search for her, and when located she would return home with him; that she was usually found with relatives or friends. The evidence further disclosed that Mrs. LaMance was afflicted with a goiter which caused her to be nervous and at times melancholy and morbid. Witnesses gave this as the cause of her leaving home on the occasions mentioned. The State's evidence failed to reveal the whereabouts of Dr. LaMance after 1 :30 P. M. of Wednesday, when he left the McClaren home, until the next day. On that day a negro maid who had been employed at the LaMance home for a number of years went to the home and found the doctor there. The maid went there for the purpose of cleaning the house, which she did. She also cooked dinner for the doctor and a visitor named ''Doc'' Harbaugh. This maid, Hazel Brown, testified as to blood spots she found in the kitchen and on the day-bed and pillow-slips. She also found fish in the ice-box, which she cooked for dinner, and fish scales in the kitchen drain. The evidence of blood spots found in the home is of little value in solving this case. It was contended by both the State and the defendant that the blood was of human origin, appellant claiming that he had received a cut on his face which bled sufficiently to account for all the blood spots. Appellant so insisted on the night the body of his wife was found. He offered to have a sample of his blood taken for comparison with the blood spots found in the home, asserting that it would be of the same type. The State's evidence also showed that there were no

blood spots on the clothing or on the body of Mrs. LaMance and that there were no wounds from which the blood could have come. There was some evidence that it might have emitted from her nose, which evidence will be referred to later. Dr. LaMance claimed that he cut his face when he accidentally broke the glass door on the night of August 9.

Harbaugh, who had dinner with the doctor, was one of the principal witnesses for the State. He was with appellant practically all of the time from Thursday until Monday, August 15, when they returned from Colorado. Harbaugh testified at length. The following statements are taken from his evidence. He testified that on Thursday, when he was at the home of LaMance, he asked appellant where his wife was, and he replied: "She is on one of her trips." On Friday Harbaugh went to the home and appellant informed him that he was worried about his wife; that all of her clothing seemed to be at home; that she had attempted to take her life on one occasion; that he, appellant, came in the other night, meaning Tuesday night, intoxicated and "she might have told me she was going to kill herself, I don't know." Appellant and Harbaugh then searched the premises. While this search was being made a party came to see the doctor and Harbaugh was asked to look in the fruit cellar. He stated he did so and then informed the doctor that Mrs. LaMance was not there. Thereafter Harbaugh drove appellant's car to several homes making inquiry as to the whereabouts of Mrs. LaMance. Appellant also visited the bus and railroad stations. After making a number of inquiries at various places appellant and Harbaugh started on the trip to Colorado, as above stated, and stopped over at Kansas City, where appellant intended to see his wife's sister, but learned that she had gone to Minnesota on a vacation. Almost immediately after appellant returned from Colorado he went to see the sheriff seeking aid in locating his wife. Harbaugh also testified that on Friday when he went to the fruit cellar at appellant's request he saw the body of Mrs. LaMance lying on a cot; that appellant at that time was near the back porch, and when appellant asked him if she were there he said "no." It may be noted here that Harbaugh testified before the coroner's jury that he did not see Mrs. LaMance in the cellar on Friday because he did not open the door. His explanation for changing his testimony was, that on Friday when appellant asked him if his wife were in the cellar he was afraid to tell him the truth because of the doctor's general appearance and the manner in which he asked the question. It will be noted here that Harbaugh, shortly thereafter, drove appellant's car and made inquiry at a number of places about Mrs. LaMance. The doctor was not with him during this time and according to Harbaugh's testimony this occurred after he had seen the body of Mrs. LaMance. Harbaugh testified that on Thursday he aided the doctor in removing the front

door from its hinges and in taking it to Brookfield to have the broken glass replaced; that the doctor told him that when on the night of Tuesday, August 9, he attempted to open the door it stuck and he threw his shoulder against it and accidently struck the glass, breaking it and cutting his face. Harbaugh further testified that the door had not been unlocked; that the facing was loose and the lock bent.

When the sheriff arrived at the LaMance home and began a search Mrs. Nell Savage, a friend of Mrs. LaMance, aided in checking the clothing of Mrs. LaMance. A general search was made. An unpleasant odor was detected in the kitchen which appellant's mother said was due to spoiled meat which had been left in the kitchen. No unpleasant odor was detected anywhere else before the body was found. At least no witness so testified. From the kitchen the sheriff and a number of others went to the back yard where the sheriff looked into the well then went to the fruit cellar. At the top of the steps was a double door set at an angle, one door opened to the left, the other to the right. At the bottom of the steps was another door which had always been kept locked with a padlock. The LaMances had one key and a neighbor another as both families kept canned fruit in this cellar. The door was found closed but not locked; and the hasp was not pushed over the staple. There was no dispute in the evidence as to the condition or position of the body. It was lying on a cot clothed in a print dress and house slippers. The same clothing Mrs. LaMance had been wearing when last seen alive on August 9, while treating a patient. The body was in an advanced state of decomposition and the odor was so terrible that men found it difficult to examine it and remove it from the cellar. Soon the odor could be detected a block away. Maggots were present in the head of the body. The sheriff and the coroner, Dr. Lucas, examined the cellar. Each testified that it was air tight; that no blow flies could have entered the cellar and that there were no such flies present. Dr. Lucas testified that he examined the maggots and found them all of the same age, that is about five days old; that maggots would not have been present unless the body had been exposed to blow flies which he stated were parents of maggots. The body was resting on its heels, hips and shoulders. The knees and back were slightly raised. The arms were extended from the shoulders to elbows and the hands and fingers were slightly clinched and were higher than the head. The body was very stiff and rigid. The arms had to be tied down so the body could be moved through the cellar door. When they were untied they returned to their extended position. There were no blood stains on the clothing, the hair was made up and two side combs were in position. A chemical analysis, by a State's witness, of the stomach and other portions of the body did not disclose the presence of any poison. One of defendant's witnesses who had analyzed the stomach found strychnine pres-

ent. No container such as a glass or a cup was found in the basement. An examination revealed a bump or raised portion on the front side of the head. Dr. Lucas, the coroner, testified that a blow sufficient to cause that injury might or might not have caused unconsciousness, or might or might not have caused death. Defendant introduced evidence that on the Sunday previous to August 9, deceased was on a fishing party; that when she entered a car she struck her head at the point where the injury was discovered causing her considerable pain. The coroner also testified that in his opinion a light streak which was noticed around the neck of the body indicated external violence, and in his opinion the condition of the nose indicated deceased had sustained a severe blow prior to her death. From the above evidence it was the opinion of Dr. Lucas that deceased came to her death as the result of external violence to head and neck. Appellant introduced evidence by experts that the light streak around the neck was due to a fold and that the only way to determine whether or not strangulation had brought about her death was to incise the neck and make a careful examination of the tissues. Doctors testifying for the defendant removed the upper portion of the skull and examined the extent of the wound to the head. They testified that the meninges, covering of the brain, had not been injured. All the doctors agreed that in cases of strychnine poisoning a body remains rigid for a longer period, sometimes more than ten days; that in deaths through other causes rigor mortis is present only a few days. Evidence of statements made by appellant are relied upon by the State as being incriminating. In our opinion the statements attributed to appellant do not lend much aid to the State's theory. On the evening when the body was found appellant was questioned about the cot upon which the body rested. He is alleged to have stated that he did not own a ▮▮▮ cot. Later remarks were made with reference to fingerprints, whereupon appellant is alleged to have remarked that his fingerprints would be found on the cot because it had been borrowed from a neighbor for a patient sometime previous. Harbaugh testified that when he and appellant were in Kansas City he remonstrated with appellant about going to Manitou Springs; that appellant said in substance: "I have looked ahead on all of this. You leave this to me. We are going out to Mother's;" that appellant offered to buy him a ticket back home if he did not want to go to Colorado. Harbaugh also testified that appellant became intoxicated on the trip to Colorado and freely talked about how much he loved his wife.

Appellant testified at the trial but his examination was very limited. He testified that on Tuesday night, August 9, he attempted to open the door and it stuck; that he threw his shoulder against the door, missed the woodwork and broke the glass; that he sustained a cut on his face and the wound bled rather profusely. That the wound bled was corroborated by the McClarens. Appellant testified that

when he went through the broken glass door he tore his trousers, and that when he took off his shirt that night it was torn, it being an old shirt; that he made a thorough search of the premises on Friday when Harbaugh was there; that just when he intended to go to the fruit cellar Emmett Ogle came to the back porch to see him, whereupon he asked Harbaugh to look in the cellar; that Harbaugh did so and reported his wife was not there. The State had introduced evidence as to the torn trousers and shirt, both of which had blood stains on them and which had been worn by appellant on August 9, on his fishing trip. Witnesses for the State also testified that they noticed scratches on appellant's hands after August 9. Defendant's witnesses stated they noticed these scratches before August 9.

The cross-examination of a number of the State's principal witnesses disclosed that their evidence was at variance on very material points with the evidence given by them at the preliminary hearing and at the coroner's inquest. Such matters were proper for the jury to consider in passing on the weight and credit to be given to such witnesses' evidence.

A sister of the deceased testified on behalf of the defendant. She stated that she and the deceased were on friendly terms visiting each other a number of times a year. Both were graduate nurses. She stated that deceased was suffering from a goiter which rendered her extremely nervous; that at times she was very despondent, especially during the last few months of her life; that on one occasion before her marriage she had attempted to commit suicide by taking poison; that she told the witness that the next time she tried that she would not be found until it was too late. Other witnesses testified with reference to statements alleged to have been made by the deceased which indicated she contemplated suicide.

Due to the fact that this case must be remanded for another trial we will not analyze the above evidence or definitely decide whether the State made a submissible case for the jury. It will be time enough to do that if and when the case reaches this court again. It may be stated, however, that on close analysis the State's evidence may fail to disclose a chain of circumstances sufficient to make a case for a jury. We deem the evidence sufficient, however, to advise another trial. The State may be able to strengthen its case in some respects, so may the defendant. The record, however, can be materially shortened. Witnesses should not be required to go into detail as to facts admitted by both sides. For example, at least ten or more minutely described the doors of the fruit cellar, taking pages and pages of evidence on a fact over which there could be and was no dispute. Also, both sides conceded that the blood found in the home was of human origin, so why spend so much time to prove a non-disputed fact? Neither the State nor the defendant attempted to type the blood and compare it with defendant's blood. Three members of

the coroner's jury testified with reference to a dark streak found on one of the cellar doors, which in their opinion was blood. The State's witness, Koch, an expert in these matters, examined that streak and testified it was resin. If an expert, employed by the State, was of the opinion that the streak was resin we do not see why the State would introduce evidence to the contrary by non-experts who made a mere casual examination of such streak.

The defendant introduced evidence to the effect that on Sunday, August 7, the deceased, while attempting to get in a car, struck her head against the car causing her ▇ great pain. The State introduced evidence of statements alleged to have been made by this witness which contradicted his evidence. Defendant called another witness, a Mrs. Finney, and offered to prove that Mrs. LaMance, the deceased, on that Sunday evening complained of her head hurting, stating that she had struck it against a car that afternoon. This offer of proof was rejected by the trial court because of hearsay. This ruling was preserved for our review. We are of the opinion the evidence should have been admitted. The injury to the head was in the opinion of Dr. Lucas one of the causes that might have contributed to her death. The evidence was therefore of vital importance to the defense. A similar question was presented to this court in State v. Moxley, 14 S. W. 969, 102 Mo. 374, l. c. 384, also a case of a man charged with uxoricide. Evidence of statements alleged to have been made by the wife with reference to smothering spells was rejected as hearsay. Holding the ruling erroneous this court said:

"In such cases *conversations* had between the person whose health is in question, and the witness, are admissible even though made to a person other than a medical attendant. . . .

"It cannot be said how much weight such testimony as that mentioned would have had if elicited; but it might have had quite a material bearing in determining the bodily condition of the deceased on the night of her death; at any rate, the defendant had the right to have it go to the jury for what it was worth."

Clifford Austin testified on behalf of the defendant. He had been a coroner of Carroll County, Missouri, and an undertaker for fourteen years. He testified that the streak around the neck was due to a fold and was often present in a body in such a state of decomposition. He gave his opinion with reference to the condition of the nose, stating that when decomposition sets in the nose swells and has the appearance of being flattened. He also gave his opinion as to other conditions, such as the protruding of the tongue and bulging of the eyes. The court, at the State's request, ordered this evidence stricken from the record. This ruling was assigned as error. We are of the opinion that the evidence was competent. As revealed by his evidence the witness had qualified sufficiently to give an opinion. Certainly an undertaker of fourteen years, who had also served as

a coroner and testified that he had observed bodies in a state of decomposition had sufficient experience to express an opinion as to conditions usually found in such bodies. [See Cecil v. State (Tex. Cr. App.), 100 S. W. 390.] The question of the value and weight to be given such an opinion is for a jury. We are of the opinion, however, that since Austin was not a medical expert his opinion as to the cause of the bruise or the injury to the head of the deceased was properly rejected. The State briefed only the latter point, but as we understand the record the entire evidence of Austin was stricken out.

■ The trial court instructed the jury on murder in the second degree and manslaughter. The words "premeditatedly," "malice aforethought" and "deliberation" were not defined by an instruction. This was assigned as error. It was the State's theory that the injury to the head of the deceased was inflicted by the defendant. The State's witness, Dr. Lucas, testified that the injury might or might not have caused death. The State's theory of the case was that the defendant came home on August 9 in an intoxicated condition; that he entered the home by breaking a large glass door and that loud talk followed. We ask, could a jury have been justified in finding that the defendant was refused admittance to his home by his wife? That he in a rage of anger broke the door? That a quarrel followed during which appellant struck the deceased without any intention of inflicting a serious injury. If so, would a jury have been justified in returning a verdict of manslaughter? These questions are asked simply to demonstrate the necessity of a jury being fully instructed so that it may in such a case intelligently consider the evidence and render a just verdict. As to the duty of a trial court in defining such words and terms we read the following in 30 C. J. 347, sec. 601:

"Where the pleading and evidence raise the issues of deliberation and premeditation as essential elements of the offense charged, an instruction should be given which fully and explicitly defines and explains the law on these points, as applied to the facts of the case; and in such charge the court may define such terms, and may instruct as to what facts may be considered as evidence of deliberation or premeditation."

■ As to "malice" and "malice aforethought" see 30 C. J. 345, sec. 598. This court has had occasion to consider the question. [See State v. Garrett, 276 Mo. 302, 207 S. W. 784, 1. c. 787(5).] It was there held that it was the duty of the trial court to define such terms. In that case this court approved the ruling in State v. Simms, 71 Mo. 538, 1. c. 540, where the court tersely said:

"It is insisted, however, that the court should in some instruction have properly defined the words malice and deliberation used in the said instruction. These are terms having a well defined legal meaning, and the jury should have been properly instructed in regard to them; and for its failure to do so the judgment will be reversed."

See also State v. Hershon, 329 Mo. 469, 45 S. W. (2d) 60, and concurring opinion of WHITE, J., commenting on the opinion in State v. Grant, 152 Mo. 57, 53 S. W. 432; State v. Fairlamb, 121 Mo. 137, 25 S. W. 895. All of these cases hold that a definition of the words and terms under consideration is necessary. The same rule would apply as to the duty of a court in defining premeditation. [See 30 C. J. 347, 348, sections 600 and 601, and numerous cases there cited.] Under our statute, Sec. 4070, R. S. Mo. 1939, it is the duty of a trial court to instruct a jury in writing upon all questions of law arising in the case which are necessary for their information in giving their verdict. We are of the opinion that under the statute it was the duty of the trial court to define the words "premeditatedly," "malice aforethought" and "deliberation." For failure to do so the case must be remanded for trial. The State in its brief contended that it was not the duty of the trial court to define the words in question unless requested to do so by the defendant. The cases cited in support of its contention are mostly cases involving prosecutions for violations of the liquor laws where this court held that words such as "transporting" and "intoxicated condition" need not be defined unless requested. [See State v. Carter, 64 S. W. (2d) 687, (6); State v. Raines, 62 S. W. (2d) 727, 333 Mo. 538.] Such words were held not to have technical significance and to be of such common use that a jury would readily understand their meaning. This court has held in State v. Garrett, supra, that "the term 'deliberation' or 'deliberately' has a special significance in defining the crime of murder," and of course it follows that the same rule applies to the words "premeditation" and "malice aforethought." All of these terms were used in the instructions in this case. In the instructions submitting manslaughter the court defined the offense as being the wilful killing of a human being without deliberation and without malice aforethought. The State cited a number of Kentucky cases, including Hale v. Commonwealth, 267 Ky. 375, 1. c. 384; Johnson v. Commonwealth, 179 Ky. 40, 1. c. 46, holding a failure to define "wilfully" and "malice aforethought" not to be reversible error because such a failure was more likely to be prejudicial to the State than to the defendant. The court, however, said it was a better practice for trial courts to define such terms. The question of defining such words as "premeditation" and "deliberation" was not before the court. As pointed out above, the law in this and a majority of the states requires trial courts to define such words by appropriate instructions. The point must be ruled against the State.

Appellant also complained of instruction number five, informing the jury in substance that the intent with which an act is done may be inferred from all the facts and circumstances in evidence. Appellant in his brief states that the instruction assumed the facts in dispute. There is no merit in this contention. Neither is there any

merit in appellant's complaint with reference to instruction number nine submitting the question of murder in the second degree. Appellant stated in his brief that the instruction was broader than the evidence.

For the errors indicated the judgment is reversed and the cause remanded. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.