DAVID R. SPARKS v. SOL AUSLANDER, Appellant.—No. 38939.—182 S. W. (2d) 167.

Division One, July 3, 1944.

Rehearing Denied, September 5, 1944.

*John S. Leahy, John J. Nangle, George Gantner* and *William O'Herin* for appellant.

178

*Moser, Marsalek & Dearing* and *W. B. Dearing* for respondent.

BRADLEY, C.—Action for personal injury alleged to have been caused by defendant's negligence; verdict and judgment for plaintiff for $20,000, and defendant appealed.

Error is assigned: (1) On the refusal of a demurrer to the evidence; (2) on plaintiff's instruction No. 1; and (3) on argument.

Plaintiff was injured when his car, driven by him, struck the rear of defendant's car, which was parked partly on the highway. Plaintiff received a brain and other injuries. The brain injury was such that he was never able to recall anything pertaining to the accident, or shortly preceding, and through a period of several days thereafter.

Plaintiff resided in Alton, Illinois. On December 22, 1941, he was driving alone from Alton to St. Louis. About 7:15 P. M. (after dark), he had crossed over to Missouri, and was driving south on highway 99, St. Louis County. At the place of accident the highway had 4 paved traffic lanes and an 8 foot dirt shoulder on each side. Defendant, shortly prior to the accident, ▆▆▆▆ had also been driving south and alone on said highway, and at the place of accident, had a flat, left front. He had no tools to change tires, so parked his car on the west side of the highway with the left (east) wheels about a foot and a half on the pavement and the remainder of the car on the shoulder. Defendant said his lights, front and rear, were burning at the time of the accident, but there was evidence from which an inference to the contrary might be drawn. It had been raining shortly before the accident, and the pavement was wet and the shoulders were soft and muddy.

After defendant parked his car he, according to his evidence, stood immediately east of his left front fender, facing north, and tried to flag southbound cars; wanted to get to a service station for aid. Six or seven southbound cars passed him up. Not having any luck from where he was standing he decided (so the inference might be drawn) to change stands. As plaintiff's car, traveling in the west lane, approached from the north, defendant (as he told others) "stepped out on the pavement" of the west lane; he said to one witness that he had "made up his mind that that one (plaintiff's car) wasn't going to get by; I got out there to stop that car; I got out so he couldn't get by me."

Plaintiff's instruction No. 1 directed a verdict for plaintiff if the jury found: (1) That plaintiff was driving south at the place of accident; (2) that it was dark and that the shoulder on the west side was wet and slippery; (3) that defendant had parked his car on the west side of the highway, part on the pavement and part on the shoulder; (4) that as plaintiff approached said place "defendant suddenly, unexpectedly and without warning to plaintiff, moved onto said highway No. 99 and into the path of plaintiff's automobile;" (5) and "that at said time there was a northbound automobile with burning headlights, approaching said place from the south;" (6) and "that defendant's act in so moving into the path of plaintiff's automobile, if you so find, created an emergency for plaintiff and caused him to change the course of his automobile and to drive it on the west shoulder of said highway and to collide with defendant's automobile;" (7) and "that defendant knew, or by the exercise of ordinary care on his part would have known, that to so move into the path of plaintiff's automobile, if you so find, would create an emergency for plaintiff and would probably cause plaintiff to be injured and that in so moving, if you so find, defendant was negligent, and that such negligence, if any, on his part directly caused plaintiff

to be injured." The answer was a general denial and a plea of contributory negligence.

Defendant testified: "I tried to flag him (plaintiff) the same way I did the others (with his hands), and I noticed that about 150 feet away (tire marks showed about 100 feet) from my car he was leaving the highway and getting onto the shoulder, coming towards my car. Well, then I realized if I stayed there he can't help hitting me and probably kill me; so I left there and started running across the road toward the east side of the highway (defendant denied that he was at any place on the pavement except close to his left fender until he ran). Just about the time his car left the pavement I started to run to the east side. When I first saw plaintiff's car it was about 200 feet from my car; his headlights were on; at the time I started to run across the highway plaintiff's car was probably between 100 and 125 feet north of my car, and was on the shoulder."

Defendant further testified: "Just as I reached about the center of the highway (20 feet from the west edge of the pavement) he (plaintiff) hit the back part of my car. When he hit my car, it was pushed out in the center of the road just in back of me. By that time, as I reaches the center and this car (his own) reaches center, another car approached from the south, and I just had time enough to get out of the other car's way, to get on the other side (east side) of the highway when this northbound car hit my car right in the center on the right side. Q. And where was your car located in the highway with reference to the east lane at the time it was struck by this other (the northbound) car? A. It was just about on the other side (east side) of the highway, probably half on the shoulder and a little bit left on the highway. I was about the center of the highway when I first saw the headlights of the northbound car. . . . When the northbound car hit mine its (northbound) hood came off and missed me by a hair; went by the back of my head; I could just feel it graze me."

On cross examination defendant testified: "Q. When did you run out on the highway? A. Just as soon as I seen Mr. Sparks' car leaving the highway and going on the shoulder. Q. Now, you say that you ran out on the highway, don't you? A. Yes. Q. *Now, where was the Quintal car (the northbound car) when you did that?* A. *Oh, maybe about a hundred feet back (south) of me* (italics ours). Q. A hundred feet back of you? A. Back of my car when he starts off leaving the highway and getting on the shoulder. Q. The Quintal car? A. The Sparks car. Q. Where was Mr. Quintal's automobile when you ran out on the highway? A. I didn't see the Quintal car until I was in the center of the highway. Q. Where was it then? A. Then it came; there is a little knoll up there and it came up. Q. How far is that little knoll away? A. Oh, maybe twenty feet. Q. Twenty feet? A. Thirty feet, maybe; I don't know exactly how

many feet. It is something like that.'' Defendant also said that, to the best of his recollection, the northbound car was in the second lane from the east, not quite to the center, and that its headlights were burning. The highway, both north and south from the point of accident, was straight for some distance, and there was no evidence that the knoll was high enough to prevent one seeing the headlights of the northbound car.

On further cross examination defendant testified: ''Q. As you ran across the highway, weren't you at least ten to fourteen feet north of your automobile? A. No, no. Q. Where were you with reference to your automobile? A. I was in the front of the car. Q. How? A. I left the front of my car, run across, right at the front fender. Q. In front? A. By the front fender started run across. Q. As the car started across the highway, the right front fender would be towards the east? A. The right front fender? Which car are you talking about? Q. Your car. A. As it left what highway? Q. As it was pushed across the highway. A. When it was hit? Q. As it was hit and was going across where the Quintal car was traveling. A. The right fender would be toward the south. Q. Toward the south. Now, were you by the right fender? A. Yes. Q. You were by the right fender? A. Yes. The car hit right in back of me. Q. Weren't you actually from ten to fifteen feet on the other side (north) of the car? A. No. Q. And ran out from behind your automobile? A. No.''

Defendant, it would seem, placed himself to the south of his car as he and it were moving east across the highway. If so, it is not quite clear how the hood of the northbound car, when it came off, at the moment of impact with defendant's car, came so close to him.

Dewey Quintal, driver of the northbound car, and plaintiff's witness, had known defendant for some two or three years. He resided in Alton, and was returning from St. Louis. Quintal's wife and others were in his car. Quintal testified:

''I was driving north in the east lane at 45 or 50 miles per hour; I saw a car (defendant's) coming across in front of me, from the west towards the east; it was about 30 feet north and in front of me. I saw defendant at that time; he was about 10 feet north of his car and was running from west to east; he was in the third lane (from the west) when I first saw him. The front of my automobile collided with the side of defendant's car. I tried to change the course of my automobile, but didn't have time. When I ran into defendant's car he was about 10 feet north of it.''

Mrs. Quintal, a witness for plaintiff, testified: ''I saw this car (defendant's) coming; it was coming right at our car; it wasn't coming straight; I think it was southeast; it seemed to me like it was almost in the center of the four lane highway; I saw defendant at that time; he was out in the highway and was running and was about

14 feet north of his car; his car didn't have any lights on it. I was in the back seat, left side, of our car. Q. And, now then, how far over to the west side of the highway was it when you first saw it (defendant's car) coming there from your left? A. Well, I would say, to the best of my judgment, in the middle of the four-lane. It was coming right for me and it was plain to see it didn't have any headlights on. This car was in the center of the four lane highway. We were on the outer (east) lane, and it was heading for our car.''

Emil Osthoff, deputy constable and plaintiff's witness, testified that he went to the scene of the accident; that defendant told him about having a flat; he said ''he parked there with two wheels on the concrete, that is, the left side, and the tracks also showed;'' that plaintiff's car, according to the tracks on the shoulder, left the pavement about 100 feet north of the point of impact.

James Tracy, deputy sheriff and witness for defendant, testified that he went to the scene of the accident; his evidence as to where plaintiff's car left the pavement was about the same as that of Osthoff; he also said that visibility was ''a little further'' than 100 feet.

 Defendant argues that the judgment is not supported by substantial evidence. He says (1) that it is based solely on speculation and conjecture; (2) that essential facts can be supplied only by basing inference on inference; (3) that there is no substantial evidence tending to show a causal connection between the negligence relied upon and plaintiff's injuries; and (4) that the evidence tends to support equally either of several inconsistent factual inferences, some of which result in failure of proof of negligence.

If defendant is correct in either contention, then the judgment cannot stand. Weaver v. Mobile & Ohio R. Co. (speculation and conjecture), 343 Mo. 223, 120 S. W. (2d) 1105, l. c. 1110, and cases there cited; Hamilton v. Kansas City Southern Ry. Co. (inference on inference), 250 Mo. 714, 157 S. W. 622; Hamilton v. St. Louis-San Francisco Ry. Co. (no evidence of causal connection), 318 Mo. 123, 300 S. W. 787; Lappin v. Prebe et al. (that evidence tends to support equally either of several inconsistent factual inferences, etc.), 345 Mo. 68, 131 S. W. (2d) 511, l. c. 513, and cases there cited.

 It may be taken as conceded that plaintiff was driving south; that it was dark and that the shoulder on the west side was wet and slippery, and that defendant parked his car on the west side of the highway, and for the purposes of the demurrer, it will be taken as established that the car was parked partly on the pavement and partly on the shoulder. The trouble lies in the 4th, 5th, 6th and 7th hypotheses submitted in plaintiff's instruction No. 1.

Defendant said that plaintiff approached in the west traffic lane, and that when he first saw plaintiff's car it was about 200 feet away, and the evidence, as to the point where plaintiff left the pavement and went entirely upon the shoulder, varies from 100 to 150 feet. De-

fendant said, according to the evidence, that he "got out so he (plaintiff) couldn't get by me." Surely this would support the inference that he moved "into the path of the approaching car." There was no evidence as to the rate of speed at which plaintiff was driving or as to whether he reduced speed, but the result of the impact upon defendant's car would suggest considerable speed. Also, the evidence was that it was foggy and visibility, that is, of objects, as we understand, was limited to about 100 feet, which was the distance, estimated by the tire tracks, from the point where plaintiff went upon the shoulder to the point of impact with defendant's car. Also, it will be noted from the italicized portion of defendant's evidence, supra, that he said that when he ran out on the highway, the northbound car was "about 100 feet back of me," the same distance that plaintiff was in front of him when he, plaintiff, went upon the shoulder, according to the estimate based on the tire tracks. And it will be noted that defendant said that the northbound car was in the second lane from the east.

"A demurrer to the evidence admits the truth of the evidence to which the demurrer is directed, and also admits all inferences of fact which a jury might fairly draw from that evidence; and such demurrer can only be sustained when the facts in evidence and the fair inferences to be drawn from such facts are so strongly against the party at whom the demurrer is directed as to leave no room for reasonable minds to differ." Goslin v. Kurn et al., 351 Mo. 395, 173 S. W. (2d) 79, l. c. 84, and cases there cited. The situation, most favorably stated for plaintiff, adds up to this:

It is wet, foggy, visibility of objects is about 100 feet; plaintiff was approaching from the north at considerable speed in the west lane; when he was about 100 feet away from defendant's unlighted car, parked on the west side with left wheels about a foot and a half on the pavement, defendant shows up in the west lane flagging; at the same time a northbound car, headlights burning, is about 100 feet south of the point of accident and in the second lane from the east, and is approaching at 45 or 50 miles per hour; plaintiff, in the situation, went upon the west shoulder and struck the rear of defendant's car, resulting in the injuries complained of.

It is true that after defendant had said that the northbound car was about 100 feet south of him when he ran out on the highway, he also said that he did not see the northbound car until he "was in the center of the highway."

"Where a party relies on the testimony of a single witness to prove a given issue, and the testimony of such witness is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it, with no explanation of the contradiction, and no other fact or circumstance in the case tending to show which version of the evidence is true, no case is made, and the jury should

not be permitted to speculate or guess which statement of the witness should be accepted. On the other hand, if, in such a case, the conflicting and contradictory statements of the witness are reasonably explained, or if there are other facts and circumstances in the case tending to show which story of the witness is true, and from a fair consideration of all the facts and circumstances in evidence a jury could reasonably determine which statement of the witness should be accepted as true, then the credibility of the witness and the weight to be given to his testimony are questions for the jury.'' Goslin v. Kurn et al., supra. We think that there are facts and circumstances here which make what defendant said as to where the northbound car was when he ran out in the highway a question for the jury. Defendant could hardly have misunderstood his counsel who inquired as to where the Quintal car (northbound) was when he (defendant) ran out on the highway. To this plain, simple question, defendant answered, ''Oh, maybe about 100 feet back of me.'' Then after a question or two, as appears, supra, defendant said that he did not see the northbound car until he was in the center of the highway. It is not likely that defendant got the names of plaintiff and Quintal confused when he first answered, because he was acquainted with Quintal and was not acquainted with plaintiff.

It is true that all the facts here cannot be made to fit plaintiff's case like a glove. For example, if it be said that when plaintiff left the pavement 100 feet north of the point of accident, the northbound car was then about 100 feet south of said point, then plaintiff's car must travel the 100 feet and strike defendant's car in time for it to be knocked some 25 feet by the time of the impact of the northbound car with defendant's car. But all these distances here concerned are estimates, and they may have been more or less than the estimates.

''It is only, when the evidence, with all of the inferences that the jury may reasonably make therefrom, are insufficient to support a finding for the plaintiff, that the court is authorized to direct a verdict for the defendant. A case should therefore be left for the jury under proper instructions, unless the conclusion follows as a matter of law that no recovery can be had on any view that may be taken of the facts which the evidence tends to establish.'' Frese v. Wells et al. (Mo. Sup.), 40 S. W. (2d) 652, l. c. 654. It was not necessary that plaintiff's evidence ''exclude the possibility of accident or of a cause for which defendant is not liable, but it is sufficient to make a submissible case if there is substantial evidence that the injury resulted from a cause for which defendant is liable.'' Cech et al. v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, l. c. 515.

Under the evidence in the present case, we think that the 4th, 5th, 6th and 7th hypotheses, supra, were questions for the jury. Frese

v. Wells, supra; Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408, l. c. 417; Cech et al. v. Mallinckrodt Chemical Co., supra.

The complaint on plaintiff's instruction No. 1 is that it is not supported by the evidence. That question is ruled, supra.

Defendant says that the court erred in permitting plaintiff's counsel (1) to make an argument ''which constituted a plea for punitive damages;'' (2) and in telling the jury to ''place themselves in plaintiff's position and determine the amount that they would want as damages;'' and (3) complaint is made respecting what plaintiff's counsel said in argument about defendant's evidence that the odor of liquor was noticed on plaintiff's breath after the accident.

There is no complaint on the amount of the verdict, hence there is no place for the first two grounds of complaint on the argument.

In the closing argument, the following occurred: ''Mr. Dearing: I tell you I feel this case keenly; I wish I had the power to inflame you men to the point where I am today. God knows I know Dave Sparks and I know his condition. And why should I with effort have to come before twelve of you fellow men and present his case? I didn't go out and bring in some record (hospital record) where someone said there was a smell of alcohol. I didn't go out and bring in a deputy sheriff here and say that a man was trying to start an automobile with the ignition off. And then he (defendant's counsel) comes here and says, 'I am not saying that he (plaintiff) was intoxicated; that may have had something to do with it; that may not have had something to do with it'—I say a lawyer shouldn't bring that kind of a thing into a court of justice, particularly when you got a helpless man—Mr. O'Herin: I object to that argument as highly improper with respect to the duties of a lawyer. The Court: Overrule the objection. Mr. O'Herin: Note an exception.''

An argument might be improper and still not be prejudicial. It would not be prejudicial unless it had some *effect* on the jury's finding for plaintiff or on the amount of damages found. And as stated, supra, no complaint is made on the amount of the verdict, hence it could not be said that the argument prejudicially affected the amount of damages. Under this record, it would not be reasonable to say that the argument materially affected the jury in arriving at a verdict for plaintiff. The trial court is allowed large discretion respecting argument, Kelso v. W. A. Ross Construction Co. et al., 337 Mo. 202, 85 S. W. (2d) 527, l. c. 541, and we do not think that discretion was abused.

From the objection made to the argument, the inference might be drawn that the complaint was solely on what was said about the duties of a lawyer and not on how the argument might affect the jury. However, we have ruled the point irrespective of this.

The judgment should be affirmed, and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.