**STATE of Missouri, Respondent,**

**v.**

**Melvin COOLEY, Appellant.**

No. 50663.

Supreme Court of Missouri,
Division No. 1.

March 8, 1965.

Norman H. Anderson, Atty. Gen., O. Hampton Stevens, Asst. Atty. Gen., Jefferson City, for respondent.

Morris M. Hatchett, St. Louis, for appellant.

HIGGINS, Commissioner.

An indictment charged that on July 4, 1963, Melvin Cooley and Robert Cooley feloniously, willfully, premeditatedly, on purpose, and of their malice aforethought, with a knife "did strike, cut, stab, and wound" Odell Davis, inflicting a mortal wound from which he died on September 1, 1963. Melvin Cooley was granted severance and, upon trial, a jury found him guilty of manslaughter and assessed his punishment at ten years' imprisonment. Sections 559.070 and 559.140 RSMo.1959, V.A.M.S. The ensuing judgment and sentence commuted the punishment to a term of seven years. Supreme Court Rule 27.04, V.A.M.R.

Several of appellant's assignments of error have the effect of challenging the sufficiency of the evidence to support the instruction on manslaughter and the jury's verdict. Accordingly, the evidence will be stated in detail.

Ernest Melvin Garrett testified that he owned a full drink tavern, Tiajuana Lounge, at 2510 North Grand, on the corner of Grand and Montgomery Streets in St. Louis, Missouri. The tavern was approximately 100 feet long and 25 feet wide. On the evening of July 3, 1963, he was present as early as 8:30 P.M. The place was fairly crowded and a "small combo" was providing music for dancing; tables were placed close together to provide more room. The Billups boys, Charles, Roosevelt, and James, were in a group of at least eight people which occupied a booth and a table pushed against it. One of the Billupses (Roosevelt), while leaving the booth, walked over the top of the table and caused a bottle of water to spill on a man at a neighboring table. This man stood up and asked if Billups was going to apologize. This brought the other Billupses to their feet and a conversation followed, during which "I stepped up and told them if they was going to have an argument they would have to carry it outside." Another man, Arnold Humphrey, stood up with the man upon whom the water had spilled. When Humphrey and the latter sat down, Charles Billups and Roosevelt Billups proceeded to the rear of the bar. Humphrey remained approximately 15 minutes. He and his party left, and he returned around midnight. At this time appellant came into the place with his brothers, Lawrence and Robert, and Davis (Jerry or James, as distinguished from Odell Davis) and Rice. Davis went to the bowling machine where the Billups boys were playing and asked to join them. Arnold Humphrey returned at this point. He walked up to Davis and asked for "the thing," "a small automatic weapon." He got it from Davis and walked back to the door. Davis then got into the bowling game and tendered a dollar bet, which one Leads Bounds covered. Davis lost and refused to pay. Humphrey reappeared, this time with Robert Rice. Delores Bounds, daughter of Leads, moved in and asked Davis to leave her father alone, at which time Humphrey and Rice moved up beside Davis around the bowling machine. Humphrey took Davis's part, saying, "Yes, sir, he's not going to pay nobody a dime." Jimmy Billups turned around and asked, "What's the matter with you? You crazy?" As he turned, Humphrey pulled the pistol. Jimmy Billups "charged" him and Humphrey shot up over his head. They started to struggle and the Cooley brothers came in. "Everybody started to tussle and somebody * * * thumb-bolted the back door." People "was piling up at the door." Odell Davis (the victim) had come in with the Billups boys but was not participating in the fight. "He was standing by the bowling machine looking horrified." "Everybody kept saying that he was with them; they was after him. 'You better get out.'" He "took off" for the front door and Melvin Cooley and Robert Cooley caught up with him at the front door. "I seen one take him by each arm and smash him out into the walkway of the door. * * * I seen a knife. * * * In the hands of both of them. * * * They were cutting on him across

the front." He saw Melvin Cooley cut him in the stomach. Davis broke loose and ran on up the street. Then a Robert Moody broke and ran and everybody chased him up Montgomery. There were 25 or 30 people in the tavern when the fight started. The Cooleys were reputed to be local toughs.

Delores Bounds testified that she was present in the company of Jimmy Billups. About 12:30 she stepped outside and saw a white Oldsmobile car with six passengers drive into a filling station across the street from the Tiajuana. The six people jumped out "all sides of the car," and "rushed into the tavern." Appellant was one of them and she also saw Robert Rice, "Two-Bucket" Curtis, Jerry Davis, Arnold Humphrey, and Willie Broeck. After the shot was fired she left with Jimmy Billups and his father, James, Sr., to take Jimmy to the hospital. Jimmy had a stab wound in his chest from which he died at the hospital. She said Garrett and Lawrence Cooley were fighting and she also saw Lawrence and Jimmy fighting. She did not see the incident between appellant and Odell Davis except to see appellant running up the street with others.

Lula Lowery, another daughter of Leads Bounds, left the tavern before any altercation involving her father, whom she described as drunk. Appellant was at the tavern when she left.

Patrolman Donald Swanson went to 3500 Montgomery at 1:31 A.M. in response to a radio call. He found a Thomas (Robert) Moody bleeding and sent him to the hospital by ambulance. He examined an automobile owned by James Billups, Sr., and found a .32-caliber revolver with three spent cartridges.

Patrolman Donald Preston testified that he saw a large pool of blood in the street at Grand and Montgomery and found a case knife, Exhibit 4, near the blood.

Charles Billups testified to his presence in the Tiaujuana with his wife, Lillie Rose.

He did not see or have any fights; however, he said there was quite a bit of "noise" around the bowling machine and that someone "pushed" him as he tried to leave. He later found he had been cut (presumably when "pushed") and he went with his brother to the hospital for treatment.

Tommy Moody testified to seeing all the above principals at the Tiajuana. Appellant and his group came in around 12 o'clock. In the course of the fight he got stabbed in the side and, as he left, hit with a bottle. He ran up Montgomery Street with six or eight people after him. He did not see the incident between appellant and Odell Davis.

Detective Joseph Harr testified that he arrived at 1:31 A.M. on July 4, 1963, and found blood in the driveway of the Shell station across the street from the Tiajuana. He also found fresh blood in front of 2546 North Grand and a trail of blood leading west across Grand through a parking lot next to 2517, on across a 12-foot cyclone fence at the back of the lot at 2517, and then back to the scene. He went to the hospital and found Odell Davis, the victim. He had been "conveyed there by an unknown cruiser." He arrested appellant on July 7 or 8.

Mrs. Tressie Orange was also a patron of the Tiajuana. She saw appellant that evening but saw no fighting before she left around 12:30 A.M.

Roosevelt Billups testified to his presence at the Tiajuana in the company of his brothers, Jimmy and Charles. He admitted being the person who spilled the water in the first incident of the evening. Later in the evening he saw a fight between Lawrence Cooley and his brother Jimmy in which he intervened to hit Lawrence with a bottle. He went outside following the scuffle, having been stabbed himself. He also had some words with Melvin Cooley but denied fighting with him. He saw Odell Davis in the bar but did not see the incident between Odell and Melvin.

Dr. John J. Thomas, a surgeon, testified that he was the pathologist for the coroner's office. He performed a post-mortem examination on the body of Odell Davis September 2, 1963, at 10 A.M. He found Odell Davis to be a colored male, 19 years old, 5 feet 6 inches tall, weighing about 110 pounds. The body showed marked nutritional deficit; he was small and skinny. There were old and recent healed postoperative incisions in the right rectus. There was an old midline postoperative scar healed at the distal end; the upper end had a large abscessed cavity and fistula connected with the abscess. Infection was coming from inside the abdomen. There were wounds where glucose, blood, medication and water had been fed to the patient. A large part of the large bowel had been removed and the small bowel was sewed to the remaining portion. The liver showed chronic acute inflammation with an abscess involving the left lobe containing foul-smelling pus. He stated the cause of death to be septicemia caused by the abscess of the liver and acute diffused peritonitis. He found no stab wounds but gave his opinion that the peritonitis could have resulted from stab wounds. He had not seen the patient prior to his examination but, from the history available, deemed the treatment evidenced by the wounds he saw to have been adequate and normal for one suffering stab wounds. " * * * he developed complications from his stab wounds, which necessitated the other * * * operations that he had." He stated also that the condition he found was a complication of some type of trauma; that if the trauma was stab wounds they probably would be removed or cut through at the time of surgery.

Medical records from Homer G. Phillips Hospital, in evidence as Exhibit 5, showed that Odell Davis was admitted July 4, 1963, at 3 A.M. and that he remained in the hospital until he expired September 1, 1963, at 2:50 P.M.

Dr. Cecil Harold, a physician, testified that he was Chief Resident, General Surgery, at Homer G. Phillips Hospital. On July 4, 1963, at approximately one to two A.M., he was called to see Odell Davis who was between 18 and 20 years old, about 6 feet tall, and weighing 140 pounds. "There was a stab wound on his abdomen with a piece of his liver sticking out." Another member of the witness's medical team operated Davis immediately. The patient's abdomen was opened just to the right of the midline and a laceration of the right lobe of the liver was found. The laceration was sutured. There was also a small tear in the wall of the stomach which did not go inside the stomach. The abdomen contained about two pints (1,000 c.c.) of blood, an abnormal amount. The patient was operated again July 6, 1963, at which time free blood was found in the abdomen. This loss was replaced by vein. About three or four days later the patient started to bleed, a general oozing or seeping of blood from his abdominal incision. Investigation showed the patient to have sickle cell trait, a coagulation problem in which blood fails to harden over the wound. This was treated by repeated blood transfusions. The patient then developed "stress ulcer" as a result of his severe injury which caused additional bleeding. By July 19, 1963, intestinal obstruction had developed from the scar of the two operations. This was relieved by an operation performed by the witness in which a segment of the small bowel was removed and the bowel rejoined. During all this time the patient "was losing weight and was going downhill." He continued to bleed from the abdominal incision and developed a hematoma or blood clot in the upper end of the incision. This contributed to the oozing situation, all of which could be treated only by further transfusions which were given. This was confirmed by a specialist from Barnes Hospital called for consultation. The witness performed a fourth operation July 31, 1963, to remove a dead portion of the large bowel from the patient's right groin. About three-fourths of the colon was removed and the small bowel was

connected to the remainder. "He was in a critical condition at this time." The witness stated further that the original opening in the abdomen started at the lower margin of the stab wound. The patient became progressively worse and expired at 2:50 P.M., September 1, 1963. This witness stated that Davis died "as a result of the stab wound and associated complications. * * * If he had never been stabbed, the complications never would have been demonstrated and this bleeding problem would not be." He admitted that the liver wound he first saw normally would not cause death.

Appellant, age 21, testified that he was at the Tiajuana on July 3, 1963, and left "around nine somewhere; between nine and ten." He went home because his brother Robert reminded him that his mother did not want him in a tavern. He stated there were no fights or arguments, and that he did not know an Odell Davis; that he had no arguments with anyone including all the Billupses, and that he had never been convicted of a crime. He denied seeing brother Lawrence and knowing Arnold Humphrey; he admitted knowing James (Jerry) Davis but did not see him that night. Nobody saw him or knew him to be in his home. He was interviewed by the police at 2:00 P.M., and was arrested three or four days after the incident.

Appellant contends the court erred in giving an instruction on manslaughter as a result of a stabbing and cutting for the reasons that "there was no evidence * * * that * * * other causes and physical infirmities were not the proximate cause of death"; that there was no probative and cogent evidence of any "causal connection between the incident of an alleged assault of July 4, 1963, * * * and the death of Odell Davis on September 1, 1963," and that there was no evidence to support a submission of "either acting alone, or jointly with another or others." In addition he contends that the evidence was not sufficient to support a verdict because the state offered "no probative and substantial evidence as to the cause of the death of Odell Davis."

The testimony of Doctor Harold shows Odell Davis to have been a healthy man upon his arrival at the hospital, his disability or infirmity being then limited to a stab wound in the abdomen from which his liver protruded. He traced the course of treatment given and described the steady worsening and weakening of the victim due to the complications of infection, bleeding, and blood condition, all of which were triggered by the stab wound. The nutritional deficit, kidney condition, and septicemia found by Doctor Thomas, the pathologist, upon post-mortem examination all followed the original stab wound; none of these conditions existed at the time the victim entered the hospital. In the words of Doctor Harold, "If he had never been stabbed, the complications never would have been demonstrated." The testimony of the pathologist is consistent with and corroborative of the testimony of Doctor Harold, and the combination produces substantial probative evidence of the direct effect of the stab wound. Even if it be assumed that the stab wound was insufficient in itself to produce death, appellant is entitled to no comfort. In State v. Cheatham, Mo., 340 S.W.2d 16, 20[9], we quoted the rule from 26 Am.Jur. § 48, p. 191: " 'Liability for homicide does not depend upon the fact that death is the immediate consequence of the injury inflicted by the accused. One who inflicts an injury on another is deemed by the law to be guilty of homicide if the injury contributes mediately or immediately to the death of such other. The fact that other causes contribute to the death does not relieve the actor of responsibility, provided such other causes are not the proximate cause of the death.' " In an analogous situation in State v. Frazier, 339 Mo. 966, 98 S.W.2d 707, appellant struck deceased, a hemophiliac or "bleeder," on the jaw with his fist. A slight laceration resulted but it produced a hemorrhage which lasted ten

days ending in death. The attending physician gave his opinion that the blow would not have caused the death and that the death was caused by hemorrhage from the laceration. Appellant contended that the sole cause of death was hemophilia. The court applied the rule: "If one commits an unlawful assault and battery upon another without malice and death results, the assailant is guilty of manslaughter, although death was not intended and the assault was not of a character likely to result fatally." 98 S.W.2d l. c. 713[6]. We conclude that there is substantial probative evidence to support a finding of death caused by a stab wound as opposed to natural or other causes, and the instruction is not erroneous for submitting the victim's death as the direct effect of a stab wound.

As to the causal connection between the incidents of July 4 and the death of Odell Davis September 1, 1963, we turn to the testimony of Ernest Melvin Garrett, owner of the tavern and eyewitness to the matters in question. In addition to the substance of his testimony previously set out, we note these questions and answers:

"Q. You say Melvin and Robert cut at Odell Davis? A. Yes.

"Q. Where did it strike him? A. In the stomach.

"Q. You saw Melvin Cooley cut him in the stomach? A. Yes."

*　*　*　*　*　*

"Q. Is there any doubt in your mind that Melvin Cooley cut that man in the door of your tavern? A. No.

"Q. Any doubt at all? A. No, there is no doubt.

"Q. Did he do it? A. Yes."

This testimony refers to events occurring around or shortly after midnight, and such incidents followed earlier indications of anger, high feelings, and gunplay, all of which, as well as appellant's presence, is corroborated by the evidence set out earlier in this opinion. The victim was admitted to the hospital at 3 A.M., July 4, 1963, after being seen by Doctor Harold, the resident in surgery between 1 and 2 A.M., at which time the stab wound and protruding liver were observed and immediate surgery prescribed. The victim never left the hospital alive, and we conclude that there was substantial probative evidence from which a jury could connect the assault with a knife on July 4, 1963, at 2510 North Grand Avenue, to a death on September 1, 1963, at Homer G. Phillips Hospital.

Appellant's complaint of the use in Instruction No. 5 of "either acting alone or jointly with another or others" in submitting the question of appellant's guilt of manslaughter is also without merit. We read the entire charge and note that this matter was fully covered by Instruction No. 2: "All persons are equally guilty, who act together with a common intent in the commission of a crime, and a crime committed by two or more persons acting jointly, is the act of all and of each one so acting. However, the mere presence of one at or near the scene of a crime, does not render that person liable as a participator therein. If one is only a spectator, innocent of any unlawful act or criminal intent, and does not aid, abet, assist, advise or encourage another or others in the commission of a crime, that person is not liable as a principal or otherwise, and should be acquitted. If, however, a person be present, and by words or actions, aids, abets, assists, advises or encourages the crime, with the intent that the words or acts should encourage and abet the crime committed, then that person is equally guilty with the person or persons who actually commit the physical act."

■ An explosive situation prevailed at the Tiajuana throughout the evening of July 3 and early morning of July 4, 1963. The situation involved not only appellant and his brother Robert, but several others as well. The evidence thus justified giving Instruction No. 2, and when read with

Instruction No. 5, it is obvious that the jury was required to make all the findings necessary to a verdict of guilty of manslaughter. State v. Lawrence, Mo., 280 S.W.2d 842, 848[6, 7, 8].

■ Appellant contends that the court erred in permitting argument to the effect that certain persons in the courtroom were present for purposes of intimidating State's witnesses. He contends also that argument to the effect that convictions do not start until a person is 17 years of age suggests that appellant had committed infractions as a juvenile, and that such was also outside the evidence, inflammatory and prejudicial. In his brief appellant states that his objections on these accounts were sustained, and the transcript shows that the trial court, without request, instructed the jury to disregard all the matters in the argument to which appellant made general objection, and there are no requests for mistrial. The only references to these matters in the motion for new trial are: "6. That the closing argument of the Circuit Attorney was improper and inflammatory." "8. That the Circuit Attorney made improper reference to persons sitting in the audience in an effort to influence the jury by insinuating persons of rough mien were there for the purpose of intimidating the State's witnesses in the trial." "9. That the closing argument of the Circuit Attorney was improper in that allusion was made to a possible juvenile record of the accused which was not in evidence and in fact did not then and does not now exist." These assignments are conclusions at most, and do not set out or direct the trial court to any particular. portion of the argument to which they refer. They were thus too general to present anything to the trial court for corrective action and, under our Rule 27.20, V.A.M.R., are too general to have preserved anything for appellate review. State v. Davis, Mo., 367 S.W.2d 517, 521[12].

We have examined those matters as required by our Rule 28.02, V.A.M.R. The indictment is sufficient to charge murder in the second degree to which defendant, upon arraignment, pleaded not guilty. The verdict is in proper form, is responsive to the issues, and the punishment is within the limits prescribed by law. Defendant and his counsel were present throughout the trial and counsel represented appellant on appeal. Allocution was granted and the judgment and sentence was responsive to the verdict.

The judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.