**STATE of Missouri, Respondent,**

v.

**Raymond Denver BANISTER, Appellant.**

**No. KCD 26727.**

Missouri Court of Appeals,
Kansas City District.

Aug. 5, 1974.

W. V. Mayse, Bethany, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Defendant, charged with murder in the second degree by information in the Cir-

cuit Court of Harrison County, stood trial by jury and was found guilty of manslaughter. The jury assessed defendant's punishment at five years confinement in the Department of Corrections. Judgment and sentence were rendered accordingly, and defendant duly perfected an appeal to this court.

The victim was defendant's six month old son, thereby presenting a tragic case of parricide for appellate review. The state alleged and contended that the infant's death resulted from assaults inflicted upon him by defendant. Although presenting nine separate points of alleged error in his brief, they have been consolidated by defendant in the argument portion of his brief, where he states:

"Essentially, the foregoing assignments of error which defendant claims requires reversal of defendant's conviction and discharge of defendant, *present the sole question of whether the evidence is sufficient as a matter of law to sustain the judgment of conviction against the defendant.*" (Emphasis added.)

Resolve of the "sole question" raised by defendant on appeal, sufficiency of the evidence to sustain defendant's conviction, compels a review of the evidence in the light most favorable to the State, considering as true all evidence and reasonable inferences favorable to the State and disregarding all evidence and inferences unfavorable to the State. State v. Strong, 339 S.W.2d 759 (Mo.1960); State v. Bruton, 383 S.W.2d 525 (Mo.1964); State v. Archer, 328 S.W.2d 661 (Mo.1959); State v. Colthorp, 437 S.W.2d 75 (Mo.1969); and State v. Watson, 350 S.W.2d 763 (Mo. 1961).

It was the sole prerogative of the jury to weigh and evaluate the evidence and make the crucial determination of whether the evidence proved beyond a reasonable doubt that defendant was guilty of manslaughter. The duty of this court on appeal is limited to determining whether there was sufficient substantial evidence to support the jury's determination that defendant was guilty of manslaughter. State v. Strong, 484 S.W.2d 657 (Mo.1972); State v. Crawley, 478 S.W.2d 344 (Mo.1972); and State v. Odom, 353 S.W.2d 708 (Mo.1962).

Manslaughter is the unjustifiable, inexcusable and intentional killing of a human being without deliberation, premeditation and malice. State v. Ayers, 470 S.W. 2d 534 (Mo. en banc 1971); and Section 559.070 RSMo 1969, V.A.M.S. Where death results from an unlawful assault and battery, and the assault is without malice, the assailant is guilty of manslaughter, even though death was not intended and the assault itself was not of a character likely to result in the death of the person assaulted. State v. Watson, 364 S.W.2d 519 (Mo. 1963); and State v. Cooley, 387 S.W.2d 544 (Mo.1965). The immediate occurrence of death as a consequence of an injury inflicted by an assailant is not required to sustain a manslaughter conviction; the assailant is deemed guilty of manslaughter if the injuries inflicted contribute mediately or immediately to the death of the person upon whom the injuries were inflicted, even if other causes contribute to the death, so long as the other causes are not the proximate cause of the death. State v. Cooley, supra.

The following evidence, comportable with the above enumerated principles of law, completely dissipates defendant's contention that substantial evidence was lacking, as a matter of law, to sustain his conviction of manslaughter.

Defendant's infant son was pronounced dead at approximately 8:00 P.M. on Monday, July 31, 1972, at the Noll Memorial Hospital, Bethany, Missouri, by Dr. Gilbert Frank Scamahorn. The infant was brought to the hospital by defendant, his father, and Linda, his mother, and died approximately five minutes after Dr. Scamahorn arrived. Dr. Scamahorn observed that the infant was "very pale" and that "three or four bruises showing on both the left and right side of the head" and

"bruises on the top of the head and two bruises, one on each cheek". In response to a hypothetical question Dr. Scamahorn testified, "It was my opinion that the child's death was due to trauma which is demonstrated by the bruises which were visible." Dr. Scamahorn also offered as his medical opinion that a subdural hematoma, discovered by Albert Upsher, M. D., a board certified pathologist, in the performance of an autopsy on the infant on August 1, 1972, was the producing factor or cause of the infant's death.

Linda, the infant's mother, testified that on July 25, 1972, defendant "took his hand and kept slapping [the infant's] face, back and forth" and "he just hit him hard with his hands". Linda further testified that on July 27, 1972, defendant "picked . . . [the infant] . . . up by the back of the neck, and just hit his head against the closet door" two times. Additionally, Linda testified that on the afternoon of July 31, 1972, she discovered defendant "was hitting on him [referring to the infant] and he told me to take him, he was afraid he was going to kill him" and that defendant "had him by the back of the neck and pushed his face into the [car] seat". Although defendant testified that the infant fell out of bed on July 25, 1972, and that Linda accidently allowed a screen door to close on the infant's head on July 27, 1972, Linda denied both occurrences.

Defendant testified that on the afternoon of July 31, 1972, preceding the infant's death, an automobile he was driving, and occupied by the infant and his mother Linda, ran off of a road in Bethany and went into a grader ditch and then came back on to the road. Linda, although recalling the occurrence of such an accident, refused to admit that it occurred on July 31, 1972, and said she could not recall the date of its occurrence. Additionally, Linda testified that the automobile accident occurred "because [defendant] was drunk". Linda further testified that she didn't remember seeing any bruises on the infant caused by the automobile accident. Dr. Scamahorn testified that it was "possible, but unlikely" that the bruises he observed on the infant's head and face at the hospital the night of his death were caused by the automobile accident.

Albert Upsher, M.D. testified that he performed an autopsy on the child on August 1, 1972, which disclosed the following multiple hemorrhages: two on the right side of the infant's face and two more lower down on the right side of the infant's face in the chin area; two on the left side of the infant's face and one lower down on the left side of the infant's face in the chin area; two on the infant's left arm between the elbow and shoulder; four involving the infant's scalp, "up on the top of the head, roughly right about the crown of the head"; two "beneath the scalp, that is between the bottom of the scalp and the skull"; and one on the left side of the brain which he described as a subdural hematoma because of its location and the fact that it was "more in volume than the other areas that were identified". Dr. Upsher further testified that during the course of his autopsy all the organs of the infant were examined and "they were all essentially normal for a six month old child"; there was "no evidence of any congenital anomalies"; and microscopic studies of small samplings of all the infant's organs "confirmed our gross findings that we do not have such things as pneumonia or infectious diseases or anything that we can identify that might be related to the demise of this infant." In response to being asked if he had an opinion as to the cause of the infant's death, Dr. Upsher replied as follows, and also gave the following testimony in response to additional questions in sequence:

"A. Well, in view of some 15 areas of hemorrhage that I can identify externally on this youngster, all in a certain anatomical position, plus the hemorrhage in the brain, my opinion is that this child died from some type of traumatic—that means forceful—injury.

Q. Could it have been more than one injury?

A. That's correct, it could and probably was.

Q. What do you base that on?

A. Well, I base that impression upon the fact that the areas of hemorrhage are not all apparently in the same time schedule. These areas of hemorrhage beneath the skin were bluish in discoloration and this usually takes any place from 24 to 48 hours, *or perhaps a little longer*, for this color pigment to develop. *So these injuries were all sustained at least two to three days or maybe longer before the infant was brought to the Noll Memorial Hospital.*

Now, the area in hemorrhage on the brain appeared to be something perhaps of a more recent date, perhaps 24 hours, maybe 48, *and it's even possible it could be older than that. It cannot be beyond about ten days because there is no organization of the clot, which almost invariably will occur in this type of hemorrhage on the surface of the brain.*" (Emphasis added.)

Dr. Upsher further testified on direct examination, absent objection, that it was "possible" that striking the infant's head on a closet door on or about July 25, 1972, could have accounted for the areas of hemorrhage that were not externally visible. On cross-examination Dr. Upsher testified that the subdural hematoma, an area of hemorrhage which was not externally visible, indicated a greater amount of damage to the infant's system than any of the other areas of hemorrhage and that although the four areas of hemorrhage on the infant's scalp, the two "between the bottom of the scalp and the skull", and the subdural hematoma were all involved in the infant's death in "some kind of sequence", he was more suspicious of the subdural hematoma "because of its strategic location" and that it was the most probable primary cause of the infant's death.

On cross-examination, Dr. Upsher testified in terms of both "possibility" and "probability" that the more damaging hemorrhages and subdural hematoma were produced by trauma or traumas occurring between 8:30 P.M., Sunday, July 30, 1972, and 8:30 P.M., Saturday, July 29, 1972, although he cautiously and with specificity additionally stated on cross-examination, "*I have told you that I cannot exclude that this may have occurred prior to those days.*" (Emphasis added.)

It was undisputed that early on the morning of Saturday, July 29, 1972, defendant left for Nebraska and did not return to Bethany until early on the morning of Monday, July 31, 1972. During defendant's absence, the infant remained in Bethany. Defendant seizes upon his absence as unassailable proof that he did not inflict the injuries upon his infant son which caused his death because of Dr. Upsher's testimony on cross-examination that the most damaging hemorrhages and subdural hematoma "possibly" or "probably" were produced by trauma or traumas occurring between 8:30 P.M. Sunday, July 30, 1972, and 8:30 P.M. Saturday, July 29, 1972. The fallacy of defendant's position in this respect is that it completely ignores the testimony of Dr. Upsher on direct examination that the "areas of hemorrhage beneath the skin . . . were all sustained at least two or three days *or maybe longer* before the infant was brought to the Noll Memorial Hospital" and that although the subdural hematoma appeared to be of a more recent date, "perhaps 24 hours, maybe 48, *and it's even possible it could be older than that*" but could not be "*beyond about ten days*", and his reservation on cross-examination "*I have told you that I cannot exclude that this may have occurred prior to those days*". (Emphasis added.) In view of the aforementioned, defendant's undisputed absence from Bethany between the morning of the 29th of July, 1972, and the morning of July 31, 1972, was not fatally destructive of the State's case since the traumas, and the dates thereof, that

Linda, the infant's mother, testified that defendant inflicted upon his infant son occurred in a chronology consistent with the above evidence which defendant apparently, although erroneously in view of the verdict returned, assumes the jury ignored.

It should be noted that Dr. Upsher testified on cross-examination that there was no relation between the automobile accident that defendant claimed occurred on the afternoon of July 31, 1972, and the four areas of hemorrhage on the top portion of the infant's head, the two internal hemorrhages and the subdural hematoma, nor was there any relation between them and defendant's act of pushing the infant's face into the car seat on the afternoon of July 31, 1972, because of the size of the hemorrhages and subdural hematoma.

Linda, the infant's mother, testified that no one other than defendant ever struck their infant son. Linda's mother, Beverly Hill, testified that while at the hospital the evening of the infant's demise, defendant told her, "I done it with my bare hands."

■■ The rules of evidence governing opinion and expert testimony in criminal cases are the same as those governing opinion and expert testimony in civil cases. State v. Quilling, 363 Mo. 1016, 256 S.W. 2d 751, 752 (en banc 1953); and State v. Bannister, 339 S.W.2d 281, 282 (Mo.1960). It has become firmly established in this state that opinion or expert testimony that does not go beyond "possibility", "probability", "could have", or "might have", is nevertheless admissible and of probative value to show causation if corroborated by other evidence tending to show causation. Baker v. Kansas City Terminal Ry. Co., 250 S.W.2d 999 (Mo.1952); Stephens v. Guffey, 409 S.W.2d 62 (Mo.1966); and Gray v. Koplar-Barron Realty Co., 497 S.W.2d 185 (Mo.App.1973). Accordingly, Dr. Upsher's opinion that it was "possible" that striking the infant's head on a closet door on or about July 25, 1972, could have accounted for the areas of hemorrhage that were not externally visible was admissible and of probative value to aid the jury in determining that the infant's demise was caused by assaults inflicted upon him by defendant since it was corroborated by other evidence tending to show causation. Evidence of (1) the various assaults inflicted upon the infant by defendant, (2) that no one else struck the infant, (3) the various areas of hemorrhage on and about the infant's face and head which were attributed to traumatic causes, (4) opinion testimony that went beyond "possibility" or "probability", for example, that the infant died "from some type of traumatic—that means forceful—injury", (5) that the infant's death ensued within seven days after the first assault inflicted upon him by defendant, and (6) defendant's statement, "I done it with my bare hands", all corroborated the assaults inflicted by defendant as the cause of the infant's death.

Defendant also attacks the sufficiency of the evidence on the ground that stripped of the testimony of Linda, mother of the infant, sufficient substantial evidence was lacking to sustain his conviction. This attack is bottomed on the assertion that Linda's sworn testimony at the trial was replete with numerous instances of contradictory testimony previously given by her under oath at the coroner's inquest, defendant's preliminary hearing, and on deposition, and therefore inherently lacked credibility. At the trial Linda's explanation for the previous contradictory testimony was that defendant, who was Linda's husband at the time, "told me what to say" and that she was scared. On cross-examination she was asked if she was lying at the trial and her answer was, "No. I wanted the truth to come out and it is coming."

■ Defendant's argument that Linda's testimony failed to constitute substantial evidence for the jury to consider is stripped of viability by the recent case of

State v. Dodson, 490 S.W.2d 92 (Mo.1973), wherein the Supreme Court, 1. c. 95, held:

"*Ordinarily, discrepancies and inconsistencies in the testimony of a witness are matters for the determination of the jury.* Miller v. Mutiplex Faucet Co., Mo., 315 S.W.2d 224; Pettis v. St. Louis Public Service Co., Mo., 240 S.W.2d 909; Ryan v. United States, CA 8, 99 F.2d 864; State v. Washington, Mo., 383 S.W.2d 518; State v. Spraggins, Mo., 368 S.W.2d 407. It has been held several times that where the testimony of a single witness on an issue is contradictory, with no explanation and no circumstance tending to show which version is correct, no case is made; *that, however, if the conflict is reasonably explained, or if explanatory circumstances are present, then the credibility and weight of the testimony are for the jury.* Sparks v. Auslander, 353 Mo. 177, 182 S.W.2d 167; Goslin v. Kurn, 351 Mo. 395, 173 S.W.2d 79; Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644." (Emphasis added.)

See also dictum in State v. LaMance, 348 Mo. 484, 154 S.W.2d 110, 117 (1941), where the Supreme Court stated that material variances in the testimony of a number of the State's principal witnesses between their testimony at trial and their testimony at a preliminary hearing and coroner's inquest "were proper for the jury to consider in passing on the weight and credit to be given to such witnesses' evidence." This court will not and should not invade the jury's exclusive fact finding realm, particularly in view of Linda's explanation and the presence of explanatory circumstances. The exclusive nature of the jury's right to weigh and evaluate a witness' testimony, and the gravity attendant to such right, are demonstrated in Margiotta v. Aycock, 162 Va. 557, 174 S.E. 831, 834 (1934) where the Supreme Court of Appeals of Virginia stated, "A jury has the right to believe the testimony of a confessed perjurer though it should weigh his statements with great caution."

The evidence delineated herein favorable to the State, if believed by the jury, as it obviously was, supported a finding by them on all the requisite elements of manslaughter, including defendant's criminal agency as the cause of his infant son's death.

Judgment affirmed.

All concur.